Revised January 28, 2002

**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

_____

**No. 01-60216**
_____

**YVONNE E. VANCE,**

**Plaintiff-Appellee,**

**VERSUS**

**UNION PLANTERS CORP., ET AL.,**

**Defendant,**

**UNION PLANTERS BANK, N.A.,**

**Defendant-Appellant.**

_____

Appeal from the United States District Court
for the Northern District of Mississippi
_____

January 10, 2002

Before JONES and DeMOSS, Circuit Judges, and FELDMAN,[*] District
Judge.

DeMOSS, Circuit Judge:

Plaintiff Yvonne Vance sued Union Planters Bank, N.A. under

Title VII, alleging gender discrimination.  A jury awarded her

_____

[*]  District Judge of the Eastern District of Louisiana, sitting
by designation.

$30,000 for lost wages and benefits, $20,000 for emotional distress, and $390,000 in punitive damages. The district court later reduced the compensatory and punitive damage awards to $300,000 to comply with Title VII's statutory limits on employer liability. 42 U.S.C. § 1981a(3)(D).

On appeal by Union Planters, we affirmed the district court's judgment as to liability. *Vance v. Union Planters Corp.*, 209 F.3d 438, 447 (5th Cir. 2000) [*Vance I*]. However, because we determined that the record was not sufficiently developed to determine the amount of the applicable damage cap, we vacated the damages award and remanded to the district court for further discovery and an evidentiary hearing.

On remand, the district court set a time period for discovery and a briefing schedule for the parties to submit evidence and arguments to the court. After reviewing the parties' voluminous submissions, the court concluded again that the judgment was subject to a $300,000 Title VII cap. Union Planters then brought this appeal. Because we determine that $100,000, rather than $300,000, is the applicable statutory cap, we modify the damages portion of the district court's judgment.

**I.   THE DAMAGES CAP**

The limitations on Title VII compensatory and punitive damages is found in 42 U.S.C. § 1981a(b), which provides:

        (3)  Limitations

        The sum of the amount of compensatory damages
        awarded under this section for future pecuniary
        losses, emotional pain, suffering, inconvenience,
        mental anguish, loss of enjoyment of life, and
        other nonpecuniary losses, and the amount of
        punitive damages awarded under this section, shall
        not exceed, for each complaining party–

        (A)  in the case of a respondent who has more than
             14 and fewer than 101 employees in each of 20
             or more calendar weeks in the current or
             preceding calendar year, $50,000;

        (B)  in the case of a respondent who has more than
             100 and fewer than 201 employees in each of 20
             or more calendar weeks in the current or
             preceding calendar year, $100,000; and

        (C)  in the case of a respondent who has more than
             200 and fewer than 501 employees in each of 20
             or more calendar weeks in the current or
             preceding calendar year, $200,000; and

        (D)  in the case of a respondent who has more than
             500 employees in each of 20 or more calendar
             weeks in the current or preceding calendar
             year, $300,000.

42 U.S.C. § 1981a(b)(3).  For purposes of this statute, we have

held that the "current year" refers to the year in which the

discriminatory act took place, not the year of judgment.  *See* **Vance**

**I**, 209 F.3d at 446; *cf.* **Dumas v. Town of Mount Vernon**, 612 F.2d

974, 979 n.4 (5th Cir. 1980).

     The statute limits allowable damages based on the number of

employees employed by the employer in the current year, but it is

silent about how to identify the relevant employer.  Thus, when

there is more than one entity involved, either through a

3

parent/subsidiary or a joint-employer relationship, the question becomes: Which entities' employees are counted for purposes of calculating the damages cap? Pertinent to this inquiry is the question of whether the complaining employee in a particular case was denied a new job with a *new* employer (i.e., a "failure to hire" claim), or whether the complaining employee was denied a transfer to another nominally independent, but sufficiently interrelated, entity (i.e., a "failure to promote" claim).

In ***Trevino v. Celanese Corp.***, we provided some direction on how to identify the relevant entity or entities in these types of cases:

> Ordinarily, promotion is perceived as occurring within a single company or organization. It is clear, however, that an employee may also be promoted, or denied promotion, from one to another nominally independent entity, provided these two entities' activities, operations, ownership or management are sufficiently interrelated. Whether transfer from one workforce to another constitutes a "promotion" or a "hiring" depends on the facts of each particular case; however, the degree of interrelatedness between companies required before an employee will be considered to have been "promoted" as he transfers from one to the next cannot reasonably be said to exceed that degree of connexity which the courts require for a finding of joint employer or integrated enterprise status.

701 F.2d 397, 403 (5th Cir. 1983). Factors we consider to determine if distinct entities constitute an integrated enterprise are (1) interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control. ***Id***. at 404. "Courts applying this four-part

4

standard in Title VII and related cases have focused on the second factor: centralized control of labor relations." *Id*. "This criterion has been further refined to the point that '[t]he critical question to be answered then is: What entity made the final decisions regarding employment matters related to the person claiming discrimination?'" *Id*.

## II.  BACKGROUND

Whether two employers are engaged in an integrated enterprise for purposes of Title VII is a fact intensive determination. *Id*. at 403.  Thus, a review here of the relevant facts, some of which are already set forth in our *Vance I* opinion, is necessary.  Union Planters Corporation (UPC), which already owned 100% of First National Bank of New Albany (FNB) and 100% of United Southern Bank (USB), agreed in July 1994 to purchase 100% of Grenada Sunburst Bank (Sunburst) effective December 31, 1994. *Vance I*, 209 F.3d at 440.

Following UPC's purchase of Sunburst, Sunburst's name was changed to Union Planters Bank of Mississippi (Sunburst/UPBMS); USB's name was changed to Union Planters Bank of Northwest Mississippi (USB/UPBNW); and FNB's name was changed to Union Planters Bank of Northeast Mississippi (FNB/UPBNE). *Id*.  UPC appointed Pat Davis, who had previously been the president of FNB, to run FNB/UPBNE. *Id*.  Because both Sunburst/UPBMS and USB/UPBNW

5

had branches in Oxford, UPC decided that these branches were to be consolidated into FNB/UPBNE's Oxford branch.[1]  *Id*.  Davis was charged with hiring a president for this newly consolidated Oxford bank branch.  *Id*.

Yvonne Vance, the plaintiff, had been president of Sunburst's branch in Oxford, Mississippi, for seven years and she applied for the position of president of the new consolidated branch.  *Id*. However, on March 15, 1995, Davis hired Tom Carroll instead of Vance to fill this position.[2]  *Id*.  Vance sued Davis, UPC, Sunburst/UPBMS, USB/UPBNW, and FNB/UPBNE for gender discrimination. After conducting depositions, Vance agreed that all defendants should be dismissed except UPC and FNB/UPBNE.  In January 1998, the district court also dismissed UPC, concluding that UPC and FNB/UPBNE did not constitute a single integrated enterprise.  Thus, the only remaining defendant was FNB/UPBNE.   Later in 1998, Sunburst/UPBMS, USB/UPBNW, and FNB/UPBNE merged with Union Planters Bank, N.A. (UPBNA).  Consequently, UPBNA was substituted as the defendant for FNB/UPBNE.

The trial was finally held, and the jury concluded that Davis had engaged in illegal gender discrimination in passing up Vance for this position.  *Id*. at 439.  It awarded Vance $30,000 for lost

---

[1]  FNB/UPBNE, Sunburst/UPBMS, and USB/UPBNW were separately chartered banks with other branches in locations other than Oxford.

[2]  At the time, Tom Carroll was serving as an administrative assistant to Don Ayres, president of Sunburst.

wages and benefits, $20,000 for emotional distress, and $390,000 in punitive damages.   UPBNA argued to the district court that the punitive and compensatory damages should be reduced to $100,000 because FNB/UPBNE only employed approximately 140 people at the time the discriminatory act occurred.  *See* 42 U.S.C. § 1981a(b)(3) (capping damages at $100,000 for employers with "more than 100 and fewer than 201 employees in each of 20 or more calendar weeks in the current or preceding calendar year").   However, the district court concluded that the date of judgment, rather than the date of the discriminatory act is the date on which the employee count is relevant under § 1981a.   Then it noted that UPBNA, the newly consolidated bank and the substituted defendant, had well over 500 employees on the date of judgment.   Alternatively, the court suggested that "no single subsidiary" could realistically be considered Vance's would-be employer; thus, the "discriminatory act was done on behalf of a large corporation."  Accordingly, it capped the compensatory and punitive damages at $300,000, the relevant cap for employers with more than 500 employees.   *See* 42 U.S.C. § 1981a(b)(3)(D).

The bank appealed, and this Court affirmed as to liability. *Vance I*, 209 F.3d at 440.  However, we disagreed with the district court's conclusion that, for purposes of § 1981a's cap on damages, the employer's size is measured at the date of the verdict.  *Id*. at 446.  Instead, we explained, the year of the discriminatory act is

the correct measure.  *Id*.  Thus, we remanded for the district court to determine the relevant employer and employer size on the date the discriminatory act occurred.

On remand, the district court focused on March 15, 1995, as the date the discrimination took place.  It then concluded that Sunburst/UPBMS was the relevant employer at this time for purposes of counting employees to apply the damage cap.  The court began by noting that Carroll, the person hired instead of Vance, remained on Sunburst/UPBMS's payroll until March 31, 1995.  Thus, it reasoned that if Vance had been hired on March 15th instead of Carroll, she would have likewise remained on Sunburst/UPBMS's payroll until March 31, 1994.  For this reason, the court found that Sunburst/UPBMS was Vance's prospective employer whose employees should be counted in calculating the damage cap.  The parties do not dispute that on March 15, 1995, Sunburst/UPBMS had more than 500 employees.

Alternatively, the district court concluded that, based on the factors this Court articulated in *Trevino*, 701 F.2d at 403-404, Sunburst/UPBMS, USB/UPBNW, and FNB/UPBNE constituted a single integrated entity for purposes of the damage cap.  Because these three entities had an aggregate total number of employees well in excess of 500, the court concluded that the appropriate measure of compensatory and punitive damages under § 1981a(b)(3) was $300,000.  UPBNA appeals again to this Court.

## III. ANALYSIS

We review the district court's decision *de novo*. ***Llampallas v. Mini-Circuits***, 163 F.3d 1236, 1244 (11th Cir. 1999). There is no dispute as to the number of employees employed by each subsidiary in 1995; FNB/UPBNE had approximately 140 employees, and Sunburst/UPBMS and USB/UPBNW each had more than 500 employees each. Thus, we must first resolve the question of who would have been Vance's employer had she been offered the position of president of the new branch. Then, only if we decide that Vance's would-be employer had less than 500 employees in 1995 need we reach the second question of whether the three subsidiaries, Sunburst/UPBMS, USB/UPBNW, and FNB/UPBNE, should be considered a single integrated enterprise for purposes of aggregating their employees to calculate the appropriate damages cap.

After carefully reviewing the record and the parties' evidence, we conclude that the district court erred in finding that Sunburst/UPBMS would have been Vance's employer had she been offered the position of president of the new bank. Rather, we conclude that FNB/UPBNE is the relevant employer. We reach this conclusion by reference to Carroll's position after he was hired instead of Vance.

"An individual qualifies as an employer under Title VII solely for purposes of imputing liability to the true employer if he or she serves in a supervisory position and exercises significant

control over the plaintiff's hiring." ***Haynes v. Williams***, 88 F.3d 898, 899 (10th Cir. 1996). It is clear and undisputed from the record that Davis served "in a supervisory position" for FNB/UPBNE and exercised "significant control over [Carroll's] hiring." ***Id***. The evidence reflects that Carroll was hired to run FNB/UPBNE's Oxford branch that would eventually subsume Sunbelt/UPBMS's and USB/UPBNW's Oxford branches. Carroll was hired by Davis, who was president of FNB/UPBNE, and it is undisputed that Carroll answered only to Davis and FNB/UPBNE.

Moreover, the fact that Carroll remained on Sunburst/UPBMS's payroll for two weeks after being hired for his new position—a fact the district court considered dispositive—does not alter our analysis.[3] Vance even notes in her brief that during the time that Carroll was not yet on FNB/UPBNE's payroll, he was only "technically assigned" to another bank and that "he reported [only] to Pat Davis who operated FNB . . . ." Regardless of who temporarily paid Carroll, no one has argued that Carroll actually performed work for or was supervised by Sunburst/UPBMS or USB/UPBNW. The bottom line is that the position Vance sought (which Carroll instead received) was that of president of

---

[3] After being hired as president of the new branch in March, Carroll remained on Sunburst/UPBMS's payroll for two weeks, and then he was paid by USB/UPBNW for four months, and then, finally, he began receiving pay from FNB/UPBNE in July.

10

FNB/UPBNE's Oxford branch, not that of a temporary employee of Sunburst/UPBMS or USB/UPBNW.

In sum, we hold that FNB/UPBNE's failure to place Carroll on its payroll for five months does not necessarily mean that FNB/UPBNE cannot be Vance's would-be employer for Title VII purposes. And we conclude that because Davis, acting for FNB/UPBNE, was the sole decision maker about who was hired to act as the branch president, Davis qualified as the discriminating employer for "purposes of imputing liability to the true employer"—FNB/UPBNE. *Id.*

The parties agree that FNB/UPBNE had about 140 employees in 1994. Section 1981a provides that damages cannot exceed, "in the case of a respondent who has more than 100 and fewer than 201 employees, in each of 20 or more calendar weeks in the current or preceding calendar year, $100,000." Accordingly, with FNB/UPBNE as the relevant employer rather than Sunburst/UPBMS, the correct damages cap under § 1981a is $100,000.

Because FNB/UPBNE had less that 500 employees, which represents the upper limit of the damages cap, we must now address Vance's argument that FNB/UPBNE, Sunbelt/UPBMS, and USB/UPBNW constituted a "single integrated enterprise," such that their number of employees should be aggregated in calculating the appropriate damages cap. To properly focus our analysis, we preliminarily note that the question is *not* whether FNB/UPBNE and

11

its parent company, UPC, were integrated enterprises. The district court, in its January 1998 order, applied the **Trevino** factors to correctly hold that UPC was not a single integrated enterprise with FNB/UPBNE.[4] And Vance recognizes as much in her brief.[5]

However, the district court, on remand from the defendant's prior appeal, concluded that Sunbelt/UPBMS, USB/UPBNW, and FNB/UPBNE were a single integrated enterprise. It reasoned:

> By analyzing evidence submitted by both parties in light of the **Trevino** factors . . . the court finds that during the relevant time period, in matters of administrative personnel, all decisions were made by Pat Davis in his position as the individual with administrative control over the Oxford branches of SB and USB as well as the President and CEO of FNB and said administrative decisions were on behalf of UPC; as such, SB, FNB, and USB were an integrated enterprise for purposes of Title VII liability.

We disagree. In determining whether distinct entities constitute

---

[4] UPC, as FNB/UPBNE's parent company, is not liable as Vance's would-be employer absent a finding that UPC and FNB/UPBNE are integrated enterprises. *See* **Chaiffetz v. Robertson Research Holding, Ltd.**, 798 F.2d 731, 735 (5th Cir. 1986) ("[T]he formula of **Trevino v. Celanese Corp**. . . . lets one decide whether a parent company is the *de facto* employer of the plaintiff."). The district court, after reviewing the evidence and applying the **Trevino** factors, concluded that "the plaintiff has failed to create a genuine issue of material fact as to existence of a single integrated enterprise, and therefore, the defendant Union Planters Corporations is entitle to summary judgment as it is not the plaintiff's employer."

[5] In her brief, Vance acknowledges that, prior to our decision in **Vance I**, the district court applied the **Trevino** factors "in the context of the relationship between UPB and FNB (UPBNE)." Thus, Vance properly limits her argument to the contention that Sunbelt/UPBMS, USB/UPBNW, and FNB/UPBNE constitute a single integrated enterprise.

12

a single integrated enterprise we have consistently focused, almost exclusively, on "one question: which entity made the final decisions regarding employment matters relating to the person claiming discrimination?" *Skidmore v. Precision Printing & Packaging, Inc.*, 188 F.3d 606, 617 (5th Cir. 1999); *Schweitzer v. Advanced Telemarketing Corp.*, 104 F.3d 761, 765 (5th Cir. 1997) ("The critical question is the following: which entity made the final decisions regarding employment matters related to the person claiming discrimination?"); *Chaiffetz*, 798 F.2d at 735 ("We place[] highest importance on the second [*Trevino*] factor, rephrasing and specifying it so as to boil down to an inquiry of 'what entity made the final decisions regarding employment matters related to the person claiming discrimination.'").

We have already determined that FNB/UPBNE was Vance's would-be employer and thus the employer who discriminated against her by not hiring her as president of the new Oxford branch. Accordingly, to support the district court's finding of joint enterprise between Sunbelt/UPBMS, USB/UPBNW, and FNB/UPBNE, there must be evidence that Sunbelt/UPBMS and USB/UPBNW were instrumental in making the final decision not to hire Vance. There is no such evidence in the record.

The parties do not dispute that Davis, as president and CEO of FNB/UPBNE was the *sole* person charged with making employment decisions about the new bank branch. The district court's

reference to Davis' power to make administrative decisions related to the Oxford branches of Sunbelt/UPBMS and USB/UPBNW—the two branches he was charged with merging into FNB/UPBNE's Oxford branch—is not enough to establish that Sunbelt/UPBMS and USB/UPBNW, which have their own Board of Directors and more than 500 employees each, were engaged in a joint enterprise with FNB/UPBNE. Instead, Davis' limited interim control over two of Sunbelt/UPBMS's and USB/UPBNE's branches, undertaken on behalf of FNB/UPBNE, is more realistically viewed as necessary administrative functions to facilitate the transfer and eventual merger of the two branches into FNB/UPBNE's Oxford branch. In other words, this evidence does not establish that Sunbelt/UPBMS or USB/UPBNE were involved in the decision of whether to hire Vance, or that the labor decisions between FNB/UPBNE, Sunbelt/UPBMS, and USB/UPBNE were so generally intermingled to justify treating them as a single integrated enterprise.

The district court also cited evidence about the interrelationship between UPC and each of its three subsidiaries as proof that FNB/UPBNE, Sunbelt/UPBMS, and USB/UPBNE constituted a single integrated enterprise:

> Union Planters Corporation was interrelated with its subsidiaries, including FNB, SB, and USB during the relevant period. This interrelation included, but was not limited to, filing consolidated reports to the SEC and other federal agencies, filing consolidated tax returns, serving as the centralized payroll entity, and having Common Management Agreements executed and followed by the

14

> subsidiaries. Finally, UPC, at the time in question, was the sole owner of 100% of its subsidiaries' stock.

However, this evidence does not establish that the three subsidiaries were interrelated with one another. Rather, this evidence would speak to whether UPC, as the parent company, should be considered a single integrated enterprise with each of its individual subsidiaries. As discussed previously, the district court already correctly concluded in 1998 that UPC and FNB/UPBNE did *not* constitute a single integrated enterprise, as there is no evidence that UPC participated in the decision not to hire Vance. Therefore, because there is no evidence of a sufficient interrelationship between FNB/UPBNE, Sunbelt/UPBMS, and USB/UPBNE to constitute a single integrated enterprise, we conclude that the district court erred by holding the three subsidiaries were interrelated.

## IV. CONCLUSION

We conclude that FNB/UPBNE was Vance's would-be employer for purposes of § 1981a. We also reject Vance's argument that FNB/UPBNE, Sunbelt/UPBMS, and USB/UPBNE constitute a single integrated enterprise. The undisputed evidence demonstrates that FNB/UPBNE had approximately 140 employees at the time the discriminatory act occurred. Accordingly, Vance's damages should have been limited by § 1981a(b)(3)(B), which provides that the sum of compensatory damages awarded for "future pecuniary losses,

15

emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life and other nonpecuniary losses and the amount of punitive damages" may not exceed $100,000 for a defendant who "has more than 100 and fewer than 201 employers in each of 20 or more calendar weeks in the current or preceding year."

The jury awarded Vance $30,000 for lost wages and benefits, $20,000 in emotional damages, and $390,000 in punitive damages. The $30,000 of lost wages is not subject to §1981a(b)(3)'s limitation on damages. 42 U.S.C. § 1981a(b)(2). The remaining awards for emotional distress, $20,000, and punitive damages, $390,000 are subject to the $100,000 limitation. Accordingly, we modify the district court's award to reduce Vance's total award to $130,000.