# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---
## NO. 03-09-00726-CV
---

Texas Commission on Human Rights, Texas Workforce Commission,
David Powell, and Robert Gomez, Appellants

**v.**

Marilou Morrison, Appellee

---
**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 353RD JUDICIAL DISTRICT
NO. D-1-GV-03-000863, HONORABLE STEPHEN YELENOSKY, JUDGE PRESIDING**
---

## O P I N I O N

Appellee Marilou Morrison filed suit against appellants Texas Commission on Human Rights, Texas Workforce Commission, David Powell, and Robert Gomez for discrimination and retaliation under the Texas Commission on Human Rights Act (TCHRA). *See* Tex. Lab. Code Ann. §§ 21.001-.556 (West 2006 & Supp. 2010). After a trial, the jury found in favor of Morrison and awarded back pay and compensatory damages. The district court rendered judgment on the jury verdict, awarding back pay, compensatory damages, future lost retirement and social security benefits, reinstatement, and attorney's fees. We affirm the judgment in part and reverse and render judgment in part.

## BACKGROUND

Morrison began working at the Texas Commission on Human Rights (the "Commission")[1] in 1991 as an Investigator II and was later promoted to Investigator V, the highest possible investigator position.[2] Prior to working as an investigator at the Commission, Morrison had worked for the State of Texas for fourteen years, first as an investigator in Child Protective Services, and then as an investigator of nursing-home neglect, Medicaid fraud, and insurance fraud for the Attorney General. At the time of her termination, Morrison had 26 years of service working for the State of Texas.

As an Investigator V, Morrison was assigned cases of alleged employment discrimination or retaliation and, after conducting an investigation, issued a recommendation in each case as to whether the Commission should issue a finding of cause or no cause. A finding of cause indicates that the Commission found "reasonable cause to believe that the respondent engaged in an unlawful employment practice as alleged in the complaint."[3] Tex. Lab. Code Ann. § 21.206. A plaintiff must file a complaint with the Texas Workforce Commission and exhaust the available

---

[1] To avoid confusion, we will refer to the Texas Commission on Human Rights as it existed at the time of Morrison's employment as "the Commission," and, because the Commission was later subsumed by the Texas Workforce Commission, refer to appellants in this action collectively as "the TWC."

[2] The facts recited herein are taken from the testimony and exhibits admitted at trial.

[3] When an investigator recommends a finding of cause, the case is presented to a panel of Commissioners, and, if the Commission panel agrees that cause exists, the executive director issues a written determination stating that the evidence supports the complainant's allegations. *See* Tex. Lab. Code Ann. § 21.206 (West 2006). If, after his or her investigation, the investigator recommends that a finding of no cause be issued, the executive director issues a written determination stating that the evidence does not support the complaint and dismissing the complaint. *See id*. § 21.205 (West 2006).

administrative remedies before she may proceed with a claim under the TCHRA in court.  *See id*.
§ 21.201; *Waffle House, Inc. v. Williams*, 313 S.W.3d 796, 804-05 (Tex. 2010).

In February 2001, the Commission's executive director, Bill Hale, resigned.  Hale was replaced in August 2001 by David Powell, a Caucasian male.  Morrison testified at trial that Powell made numerous comments to her that she viewed as discriminatory.[4]  For example, according to Morrison, Powell described himself as a "good ol' boy from Tennessee" and stated, "I don't have much patience for these undisciplined blacks.  We've got too many of them working here."  Morrison also testified that Powell made offensive gestures that mocked African-Americans.

Other employees also testified that they believed Powell was racist.  Yvonne Tabares, who worked at the Commission for seventeen years and supervised three units within the Commission, recalled that Powell used negatively stereotypical gestures when telling a story about African-Americans.  Tabares testified that, after this story, she "looked at the expressions of the investigators who were black, Hispanic, Anglo, male, female, and everyone was pretty stunned . . . it was offensive."  Tabares also testified that Powell told her that, though he came to the Commission from the Army, he had experience with equal-employment-opportunity work because "a black had filed a complaint against him when he was in the military" and he "never ever got over that."  Tabares explained that "whenever there was discussion about the performance of black employees . . . [Powell] couldn't give any substantive, measurable rationale for what he was saying,

---

[4] Morrison is a Caucasian female.

but he would just say, well, you know, they just don't impress me. And he did not do that in contrast with the white employees."[5]

Robert Hood, an Army veteran who worked as an investigator at the Commission for twelve years, also testified that Powell "was a racist."[6] Hood testified that Powell told him that as a child "he agreed with his father that he was not going to participate in integrating with blacks at the schools." Hood also stated that Powell told the Commissioners that the Commission would never issue cause findings, that no employees would bring complaints, and that "if a citizen . . . had a complaint, [the Commission] would let it fall through the cracks, and . . . would not pursue it on behalf of the complainant party."

In addition to these alleged comments, witnesses complained that shortly after he arrived, Powell restructured the Commission's management hierarchy and hired Caucasian males to fill many of the new positions.[7] According to Hood, Powell believed that "blacks and Hispanics were not prepared to be in leadership" and were being denied leadership positions in favor of "less qualified white men." Morrison testified that Hispanics and African-Americans within the

---

[5] Tabares further testified that she had a pending Equal Employment Opportunity Commission (EEOC) complaint at the time Powell was hired, and she believed that Powell retaliated against her for this complaint by hiring a white male with no relevant experience as a supervisor instead of promoting her.

[6] Before joining the Commission, Hood worked for 30 years as a Los Angeles County Deputy Sheriff.

[7] Vicki Chesney, a Caucasian female who worked as an investigator at the Commission for fifteen years, testified that Powell "was only hiring whites, mostly male, and military" and that "he was a racist . . . because there were several qualified Hispanics" that applied for the positions but never received an interview. Patricia Herrera, a former department investigator, testified that "several of the staff . . . lodged verbal complaints" regarding Powell's hiring practices.

4

Commission applied for these jobs but did not get them, even though they had more equal-employment-opportunity experience than the candidates offered the positions.[8] She stated that she believed Powell was engaged in discriminatory hiring practices and told him in person that she felt this way. In June 2002, Morrison applied for a management opening within the enforcement division. After losing the position to another applicant, Morrison submitted an open records request for the candidates' applications, composite score forms, and interview recordings. Morrison testified that she received a higher composite score than any other applicant but was not offered the job.

On September 20, 2002, Ray Hammarth, Morrison's direct supervisor, conducted a performance review of Morrison. After giving her the highest possible rating, Hammarth recommended her for a two-step merit increase in pay.

On December 6, 2002, Morrison received a written warning from Hammarth and Vickie Covington, Hammarth's direct superior, notifying her of two alleged deficiencies in her job performance. First, the warning stated that Morrison failed to meet her case-closure goal for the previous quarter, having closed only 24 of the expected 31 cases.[9] The warning further stated that in order to make up for this deficiency, Morrison would be required to close an average of fifteen

---

[8] Vickie Covington, an African-American female, acknowledged that she was offered her job as manager of employment investigations only after a meeting between Powell and a state senator.

[9] As of November 1, the number of monthly case closures for Investigator Vs had increased from ten to eleven cases and therefore Morrison's target closures for the months of September, October, and November were ten, ten, and eleven, respectively. Morrison closed seven cases in September, ten in October, and seven in November.

cases per month during the next quarter.[10] Second, the written warning stated that a 2.5-hour absence by Morrison on November 21 put Hammarth in an "untenable position" because she did not notify anyone in advance of her absence. Morrison claimed that this absence was due to an emergency plumbing issue at her residence. The warning concluded by stating that "failure to correct the above deficiencies will result in additional disciplinary sanctions."

Morrison testified that case-closure rates were usually calculated on a yearly rather than monthly basis. Morrison further testified that it was common for investigators' closure rates to be lower during the holiday season but that during her twelve years at the Commission, she never failed to meet the annual case-closure goal. Although month-to-month case-closure fluctuations were common, Morrison testified that she was unaware of any other investigator who had received a written warning for failing to meet the average monthly closure rate in any particular quarter. Hammarth testified that Powell instituted quarterly reviews for all investigators, and that Morrison was the only investigator under his supervision who did not make her quota for that quarter. On cross-examination, Covington acknowledged that, during the prior year, Morrison met her yearly quota and received a perfect evaluation even though Morrison closed fewer than ten cases per month during three months of that year.

As to the second deficiency identified in the written warning, Morrison testified that one of the 2.5 hours of leave constituted her lunch break, and that she missed little more than the office Thanksgiving luncheon. When she returned, she completed a leave-request form for the time.

_____

[10] Morrison noted at trial that in order to make up for the missing seven cases in three months, she needed only to close thirteen to fourteen cases per month, rather than the fifteen cases dictated by the written warning.

6

Morrison also testified, as did Chesney, that it was common for individuals to leave the office when an emergency arose and submit a leave-request form upon returning. Morrison was not aware of any other employee who received a written warning for failing to notify a supervisor before leaving the office during an emergency.

Three days after receiving the written warning, Morrison sent an email to Hammarth and Covington responding to the allegations. Hammarth replied to Morrison's email with a memorandum stating, "Please be advised that your past performance as an Investigator V is not in question. Based on your last performance evaluation . . . , I have every confidence that you will continue to do an excellent job now and in the future."

On December 19, Morrison spoke at a Commission meeting and informed the Commissioners that she believed Powell had engaged in discrimination against African-Americans and Hispanics. Morrison stated that Commission employees had filed sixteen complaints against Powell in the fourteen months he had been at the Commission. She also relayed two comments by Powell that she believed to be discriminatory: that "it came as a revelation to him that there was discrimination in housing" and, in response to a Juneteenth celebration, that "his family celebrates freedom every day." Morrison further claimed that Powell "ha[d] lied . . . repeatedly," hired unqualified managers, including Covington, who Morrison stated "doesn't understand how civil rights works," and refused to allow his employees to find cause (i.e., discrimination) in the Commission's cases. The Commission later conceded that Morrison's comments at the Commission meeting were protected speech.[11]

---

[11] This concession was contained in a document filed with the EEOC as a part of the investigation into Morrison's retaliation complaint.

7

Nearly a month later, on January 17, Morrison was asked to meet with Hammarth and Covington in Covington's office. On Hood's advice, Morrison brought fellow investigator Patricia Hererra as a witness and tape recorded the conversation with a device concealed in her pocket.[12] At the meeting, Covington presented Morrison with a letter of counseling notifying her of several behaviors that purportedly violated the Commission's policy manual. The letter of counseling also claimed that Morrison had behaved rudely and unprofessionally on a number of occasions during the previous three months and had "continuously tried to discredit and undermine" Covington. Morrison testified that she had never before been told that any of her behavior was rude or unprofessional.

The letter claimed that on October 23, Morrison provided false and misleading information about a case file. Morrison testified that this allegation referred to an occasion on which Hammarth asked Morrison whether she had a certain file in her office, and Morrison responded "no." According to Morrison, she later realized that she was mistaken and did have the file, at which time she apologized and gave it to Hammarth. Hererra testified that it was common for files to go missing on a daily or weekly basis, and that she had experienced missing case files in the past, but was never disciplined for them.

---

[12] Hood testified that he advised Morrison that she "better take a tape recording" and a witness because, as a former police officer, he had "profil[ed] [Covington] and her temperament" and knew that Morrison was "in trouble, and she needed all the backup that she could possibly have."

An audio recording of the meeting was admitted into evidence at trial.

8

The letter of counseling also characterized Morrison's behavior during several meetings as violating the policy manual, including a November 12 meeting between Hammarth and Morrison (Covington was not in attendance) in which Morrison had communicated her concerns that the case load was being assigned in a discriminatory manner. Further, the letter alleged that Morrison had been "rude, unprofessional, and combative" to Covington and others at the December 19 Commission meeting.

The letter of counseling also accused Morrison of modifying her weekly report to include vacation time and sick leave "in an attempt to justify [her] inability to meet [her] case closure standard." Finally, the letter stated that Morrison sent Covington an email alleging that, after leaving two completed cases in Hammarth's inbox, she had not gotten credit for them and that Covington or another supervisor must have reviewed them and failed to give her credit.

As a result of these alleged policy-manual violations, the letter stated that Hammarth would monitor Morrison's behavior for the next year. The letter indicated that Morrison's failure to comply with the conditions outlined therein "may lead to further disciplinary action up to and including termination."[13]

During the January 17 meeting in which Covington and Hammarth presented Morrison with the letter of counseling, Morrison reiterated her belief that she was being targeted because of her complaints about discrimination at the Commission, stating:

---

[13] The letter's conditions included exhibiting "professional behavior," being truthful, and ceasing her "efforts to undermine [Covington] . . . and the agency as a whole."

Talk about rude and unprofessional. Rude and unprofessional goes two ways, Ms. Covington. You are rude and unprofessional to me on a consistent basis. You discriminate against and retaliate against me and others. Is that not rude and unprofessional?

. . . .

You're not watching anybody else—except maybe Patty [Hererra]—because she filed a[n EEOC] complaint.

. . . .

OK. I've read [the letter]. Actually, I see there is no point in discussing anything with you because your efforts to retaliate against me for opposing unlawful discrimination is obvious and on the record.

At the conclusion of the meeting, Morrison asked to be excused. As Morrison exited the room, the following exchange took place:

| | |
|---|---|
| Covington: | You can't intimidate me, Marilou. |
| Morrison: | I'm not trying to intimidate you. |
| Covington: | Get out of my face. |
| Morrison: | I beg your pardon? |
| Covington: | Get out of my space. |
| Morrison: | Your space? Is it all your space? Well, I beg your pardon. I won't come into your office ever again. |
| Covington: | Ray [Hammarth], whenever Marilou comes into my office you are to come with her. |
| Morrison: | Oh, and will you not come into my office unescorted? |

[Covington agrees]

10

Morrison:     Good, I suggest that you not.

Covington:    I take that as a threat.

. . . .

Morrison:     OK, please do.

Shortly afterward, Covington sent an email to Powell and the Commission's general counsel alleging that at the end of the meeting, Morrison stood up, bent over her, and looked at her in a threatening manner. She claimed that Morrison attempted to physically intimidate and threaten her and recommended that Morrison be terminated. At trial, Covington testified, "The way she looked at me, I never wanted to be in a room with her alone ever again." Hammarth agreed that there was tension between the two women during the meeting and that Morrison "stood over Ms. Covington."[14]

Hererra testified that Covington's behavior during the meeting was condescending, and that Covington would not respond to Morrison's questions about the allegations. In a written statement, Hererra said that she "did not see or feel any threatening behavior." Morrison testified that she and Hererra stood during the entire meeting due to lack of space and that she did not threaten Covington.

On the next work day, January 21, Morrison filed an EEOC charge of discrimination and retaliation against the Commission and presented a copy to Powell. Within two hours of giving

---

[14] Hammarth issued two statements for Morrison's employee file regarding the meeting's events. His first statement contained no mention of any intervention during the women's argument. In his second statement, Hammarth claimed that he got out of his chair and stood between the two women to reduce the tension.

11

Powell a copy of the charge, Morrison received a letter notifying her that the Commission was conducting an investigation regarding the events of the January 17 meeting and that she had been placed on administrative leave.

On January 23, 2003, Morrison's employment with the Commission was terminated "based upon conduct that seriously put in danger the safety of Ms. Vicki Covington. . . . Specifically, [Morrison] exhibited unprofessional behavior towards Ms. Covington on January 17, 2002 [sic], that culminated in a severe act of threat and intimidation." Pursuant to the Commission's appeals procedure, Morrison appealed her termination. After a telephone conference between the commissioners designated to hear her appeal, in which Morrison was not invited to participate, the Commission affirmed her termination.

Morrison filed suit March 18, 2003 against the Commission, the TWC, Powell, and Robert Gomez, Powell's successor, for retaliation under the TCHRA. Shortly thereafter, the legislature passed a bill abolishing the Texas Commission on Human Rights and delegating the duties and obligations of the Commission to the Civil Rights Division of the Texas Workforce Commission. *See* Act of June 18, 2003, 78th Leg., R.S., ch. 302, 2003 Tex. Gen. Laws 1279.

Claiming growing debts and difficulties in finding replacement employment, Morrison filed for retirement benefits with the State of Texas several months after her termination at the age of 58. Morrison chose to receive a $25,000 initial lump sum and $1,975 in monthly retirement benefits. At age 62, Morrison began receiving social security benefits of $1,024 per month. Morrison testified at trial that had she not been terminated, she would have retired at age 66

12

and would have received monthly retirement benefits of $3,705 and social security benefits of $1,419 per month.

After a five-day trial, the jury answered "yes" to the question, "Did [the defendants] take adverse personnel actions against Marilou Morrison because of her opposition to an unlawful discriminatory practice?" and awarded $300,000 in back pay, $150,000 in past compensatory damages, and $150,000 in future compensatory damages. After the jury verdict but before judgment was issued, the original trial judge passed away. The case was reassigned to another judge, who, after a post-trial hearing on reinstatement, rendered judgment on the jury verdict awarding $149,801 in back pay, $300,000 in compensatory damages, $254,880 in future lost retirement and social security benefits, reinstatement as an Investigator V in the Labor Division of the Texas Workforce Commission, and attorney's fees. The TWC now appeals.

**DISCUSSION**

In four points on appeal, the TWC argues that: (1) the jury charge allowed the jury to base liability on an invalid legal theory; (2) the trial court erred in refusing to apply a cap on compensatory damages; (3) the future benefits award erroneously included compensatory damages subject to the damages cap; and (4) reinstatement within the TWC is neither permissible nor feasible.

*Jury Charge*

In its first point of error, the TWC argues that the jury charge allowed the jury to base liability on legally invalid theories. In the jury charge, the jury was asked, "Did the Texas Commission on Human Rights (TCHR) take adverse personnel actions against Marilou Morrison

13

because of her opposition to an unlawful discriminatory practice?" The charge provided no definition or instruction regarding the term "adverse personnel actions." The TWC argues on appeal that the jury could have concluded that the "adverse personnel actions" taken against Morrison included events either not included in Morrison's EEOC charge, such as her rejected application for the management position, or events that were not materially adverse as required by law, such as the written warning.

During the jury charge conference, counsel for the TWC objected to the phrase "adverse personnel actions" not because it allowed the jury to base liability on legally invalid theories, but because it allowed the jury to reach a verdict without unanimity. Counsel argued that under the question as worded, liability could be imposed based on three jurors believing that the written warning was the adverse personnel action, three believing the letter of counseling was the adverse personnel action, and four believing that the termination was the adverse personnel action. The TWC raised no objection to the charge indicating that it was concerned about legally invalid theories of liability.

Texas Rule of Civil Procedure 274 provides that "a party objecting to a charge must point out distinctly the objectionable matter and the grounds of the objection. Any complaint as to a question, definition, or instruction, on account of any defect, omission, or fault in pleading, is waived unless specifically included in the objections." Tex. R. Civ. P. 274. A "party is confined to the jury-instruction objection made at trial; any variant complaint on appeal is waived." *Lakeway Land Co. v. Kizer*, 796 S.W.2d 820, 825 (Tex. App.—Austin 1990, writ denied). The objection raised in the trial court, that the phrase "adverse personnel actions" allowed for a non-unanimous jury verdict, does not conform with the complaint now raised on appeal and did not inform the trial

14

court of any concern as to potential liability based on an invalid legal theory. *See State Dep't of Highways & Pub. Transp. v. Payne*, 838 S.W.2d 235, 240-41 (Tex. 1992) (stating that trial court must be made aware of complaint "timely and plainly"). Because the objection did not bring the present complaint before the trial court's attention, the issue has not been preserved for appellate review. *See Celanese Ltd. v. Chemical Waste Mgmt., Inc.*, 75 S.W.3d 593, 601 (Tex. App.—Texarkana 2002, no pet.) (holding that trial objection claiming jury question submitted improper measure of damages did not preserve appellate argument that same question was incomplete); *see also Lakeway Land Co.*, 796 S.W.2d at 825 (holding that trial objection claiming instruction was surplusage did not preserve appellate argument that instruction improperly commented on weight of evidence).

At oral argument, counsel for TWC argued that the objection, when viewed alongside the requested instruction (replacing "adverse personnel action" with "termination") and the TWC's concerns and objections throughout the course of trial, made the trial court aware of its objection to the scope of the phrase "adverse personnel action." However, the TWC's attorney specifically objected to the issue regarding jury unanimity and nothing further. The TWC was required to "timely and plainly" communicate to the trial court any problems with the charge language. *See Payne*, 838 S.W.2d at 240-41. It failed to do so. Because the argument on appeal does not correlate with any objection to the charge, it was waived. *See* Tex. R. Civ. P. 274; Tex. R. App. P. 33.1. We overrule TWC's first point of error.

*Damages Cap*

In its second point of error, the TWC argues that the trial court erred in refusing to apply the damages cap required by the TCHRA. We review this statutory interpretation question de

15

novo. *See City of Desoto v. White*, 288 S.W.3d 389, 395 (Tex. 2009). Section 21.2585 of the act permits an award of compensatory damages under a TCHRA action, but limits the amount available in compensatory damages based on the size of the respondent employer:

> (d) The sum of the amount of compensatory damages awarded under this section . . . may not exceed for each complainant:
>
>> (1) $50,000 in the case of a respondent that has fewer than 101 employees;
>>
>> (2) $100,000 in the case of a respondent that has more than 100 and fewer than 201 employees;
>>
>> (3) $200,000 in the case of a respondent that has more than 200 and fewer than 501 employees; and
>>
>> (4) $300,000 in the case of a respondent that has more than 500 employees.
>
> (e) for the purposes of subsection (d), in determining the number of employees of a respondent, the requisite number of employees must be employed by the respondent for each of 20 or more calendar weeks in the current or preceding calendar year.

Tex. Lab. Code Ann. § 21.2585(d)-(e). The "current year" refers to the year of the alleged retaliatory act, not the date of judgment. *Ancira Enters., Inc. v. Fischer*, 178 S.W.3d 82, 88 (Tex. App.—Austin 2005, no pet.). This damages cap, if applied, would limit the trial court's award for compensatory damages but would not affect the $149,801 back pay award, as back pay is considered equitable relief rather than compensatory damages.[15] *See* Tex. Lab. Code Ann. § 21.258.

The trial court declined to apply the damages cap to its judgment on the ground that the TWC did not plead the cap and therefore waived the affirmative defense. *See* Tex. R. Civ. P. 94

---

[15] The TWC argues in its third issue on appeal that part of the $254,880 award for future lost retirement and social security benefits is also compensatory damages subject to the damages cap.

16

(requiring parties to plead all affirmative defenses).  The TWC argues that the trial court erred because the damages cap is not an affirmative defense.  Instead, according to the TWC, the cap is part of the legislature's waiver of sovereign immunity, and is therefore jurisdictional and cannot be waived.

Two previous courts of appeals have held that the damages cap in section 21.2585 is waived if a defendant fails to plead the cap as an affirmative defense.  *See O'Dell v. Wright*, 320 S.W.3d 505, 515-16 (Tex. App.—Fort Worth 2010, pet. denied); *Shoreline, Inc. v. Hisel*, 115 S.W.3d 21, 25 (Tex. App.—Corpus Christi 2003, no pet.).  However, because neither of these opinions involved suits filed against governmental entities, the relationship between the TCHRA's damages cap and sovereign immunity has not yet been addressed.

Sovereign immunity includes two distinct principles: immunity from suit and immunity from liability.  *Texas Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 224 (Tex. 2004) (citing *Texas Dep't of Transp. v. Jones*, 8 S.W.3d 636, 638 (Tex. 1999)).  The State is afforded sovereign immunity both as to suit and as to liability unless the legislature expressly waives it.  *State v. Lueck*, 290 S.W.3d 876, 880 (Tex. 2009).  Sovereign immunity from suit deprives a court of subject-matter jurisdiction, while sovereign immunity from liability is an affirmative defense.  *Miranda*, 133 S.W.3d at 224.  Like other affirmative defenses, immunity from liability must be pleaded or else it is waived.  *Jones*, 8 S.W.3d at 638 (citing Tex. R. Civ. P. 94; *Davis v. City of San Antonio*, 752 S.W.2d 518, 519-20 (Tex. 1988)).  Immunity from liability does not affect a court's jurisdiction to hear a case. *Id*.

The TCHRA provides a limited waiver of both immunity from suit and immunity from liability as to those governmental entities meeting the act's definition of "employer."  *See*

17

*Mission Consol. Indep. Sch. Dist. v. Garcia*, 253 S.W.3d 653, 660 (Tex. 2008) (agreeing that TCHRA "clearly and unambiguously waive[d] immunity"); *see also* Tex. Lab. Code Ann. § 21.002(8)(D) (defining "employer" to include political subdivision of state or county, municipality, state agency), § 21.055 (outlining circumstances under which employer commits retaliation).

Section 21.254 of the act waives a governmental employer's immunity from suit. It provides, "Within 60 days after the date a notice of the right to file a civil action is received, the complainant may bring a civil action against the respondent." Tex. Lab. Code Ann. § 21.254. The act waives a governmental employer's immunity from liability by allowing courts to award equitable relief and compensatory damages.[16] *Id*. § 21.258 (equitable relief), § 21.2585 (compensatory damages). Compensatory damages are damages awarded to repay actual losses, *see* Black's Law Dictionary 445 (9th ed. 2009) (defining compensatory damages), and, for the purposes of the TCHRA, do not include back pay, interest on back pay, or other equitable relief, such as front pay or reinstatement, authorized by the statute. *See* Tex. Lab. Code Ann. § 21.2585(c).

Within section 21.2585, the statute also provides for a limit to this waiver via the damages caps found in subsection (d). The result is that a governmental employer's sovereign immunity is waived as to compensatory damages in an amount up to, but not greater than, the damages cap.[17] Unlike immunity from suit, however, the immunity from liability provided for by the damages cap is an affirmative defense, rather than a jurisdictional matter. *See Jones*, 8 S.W.3d at 638-39 (citing *Davis*, 752 S.W.2d at 520). Because it is an affirmative defense, the TWC was

---

[16] Punitive damages may not be recovered from a governmental entity. *See* Tex. Lab. Code Ann. § 21.2585(b) (West 2006).

[17] Equitable relief, such as back pay and front pay, is not subject to the cap.

18

required to plead it or else it was waived. *See* Tex. R. Civ. P. 94. Though the TWC did not specifically mention the damages cap in its answer, it did plead as an affirmative defense "sovereign immunity from suit and/or liability from one or more of Plaintiff's claims." Since immunity from liability was pleaded, application of the statutory cap was not waived. We therefore hold that the trial court erred in failing to apply the statutory damages cap provision to the compensatory damages award.

In order to apply the damages cap, we must next determine which agency was Morrison's employer. The TWC argues that the Commission, which had at most 44 employees, should be considered the employer, while Morrison argues that because the TWC subsumed the Commission, the TWC, which has over 500 employees, is the applicable employer in calculating any potential damages cap.[18] The Commission became a part of the TWC over six months after Morrison's appeal to the commissioners had concluded. *See* Act of June 18, 2003, 78th Leg., R.S., ch. 302, 2003 Tex. Gen. Laws 1279 (abolishing Commission effective September 1, 2003). Morrison was never employed by the TWC and never alleged any adverse personnel actions by the TWC, nor was there any testimony that the TWC exhibited any oversight of the Commission until after September 2003. Because the Commission was Morrison's employer at the time of the discriminatory conduct, we conclude that a damages cap of $50,000 applies. *See Vance v. Union Planters Corp.*, 279 F.3d 295, 300 (5th Cir. 2002) (holding that entity under which employee worked

---

[18] Morrison argues in the alternative that the State of Texas was her employer. However, the delineation of "state agencies" and "state instrumentalities" within the TCHRA's definition of "employer" indicates that the legislature intended each agency to be considered separate and apart from the State itself. *See* Tex. Lab. Code Ann. § 21.002(8)(D) (West Supp. 2010).

directly was employer for damages cap purposes).[19] We accordingly sustain the TWC's second point of error, reverse the trial court's compensatory damages award, and render judgment as to compensatory damages in the amount of $50,000.

*Future Benefits Award*

In its third point of error, the TWC asserts that the award of future lost retirement and social security benefits must be reversed because it includes compensatory damages subject to the damages cap. The trial court's award for future lost retirement and social security benefits constitutes front pay, an equitable remedy awarded to compensate the plaintiff for future lost wages and benefits. *See Giles v. General Elec. Co.*, 245 F.3d 474, 489 n.27 (5th Cir. 2001) (defining front pay); *see also Wal-Mart Stores, Inc. v. Davis*, 979 S.W.2d 30, 45 (Tex. App.—Austin 1998, pet. denied) (affirming award of front pay under TCHRA). We review a trial court's decision to grant or deny equitable relief by an abuse-of-discretion standard. *Carmona v. Southwest Airlines Co.*, 604 F.3d 848, 863 (5th Cir. 2010) (citing *Brunnemann v. Terra Int'l, Inc.*, 975 F.2d 175, 180 (5th Cir. 1992)). An abuse of discretion occurs if the trial court (1) acts arbitrarily and unreasonably, without reference to guiding rules or principles or (2) misapplies the law to the established facts of the case. *Butler v. Arrow Mirror & Glass, Inc.*, 51 S.W.3d 787, 791 (Tex. App.—Houston [1st Dist.] 2001, no pet.).

The TWC first claims that the $254,880 awarded by the trial court for lost future retirement and social security benefits should not be classified as front pay because it erroneously

---

[19] *See Hoffman-La Roche Inc. v. Zeltwanger*, 144 S.W.3d 438, 445-46 (Tex. 2004) (noting that TCHRA is modeled after Title VII and that "federal case law may be cited as authority in cases relating to the Texas Act").

includes the losses incurred by Morrison's early retirement. The TWC contends that the benefits lost due to Morrison's early retirement should be considered compensatory damages subject to the damages cap. The trial court calculated the future benefits award by subtracting the benefits currently earned by Morrison ($3,000 per month) from the benefits Morrison would have earned had she retired at age 66 ($5,124 per month) and multiplying by 120 months. The TWC argues that this calculation is incorrect because the difference in benefits was a consequence of Morrison's early retirement, rather than her termination.

The purpose of front pay is to provide the wages and benefits an individual would have received had she continued employment. Because there was evidence that Morrison would have received $5,124 per month in benefits had she not been terminated, it was not an abuse of discretion for the trial court to use this number in calculating Morrison's lost future benefits. The TWC correctly points out, however, that, when calculating the benefits that Morrison would have received had she continued working, the trial court never accounted for the extra $25,000 Morrison collected as an early-retirement lump sum. Morrison would have never received this $25,000 payment if she had continued working until age 66, the scenario on which the trial court's calculations are based. Therefore, under the trial court's lost benefits calculation, Morrison received a $25,000 windfall. We hold that the trial court's award of lost future retirement and social security benefits is excessive by $25,000.

In its second challenge to the future benefits award, the TWC claims that the separate award for future benefits is duplicative of the $150,000 jury award for future compensatory damages. At the conclusion of trial, the jury awarded Morrison $150,000 in past compensatory damages and $150,000 in future compensatory damages. The jury was instructed that future compensatory

damages included "economic losses." The TWC argues that as a result of this jury instruction, Morrison's future lost retirement and social security benefits were erroneously awarded to her twice: first by the jury in the future compensatory damages award (as "future economic losses") and again by the trial court in its award of future lost retirement and social security benefits. The TWC, however, made no trial objection to the jury charge question on damages, and is therefore barred from challenging the charge's definition of future compensatory damages on appeal. *See* Tex. R. Civ. P. 274; Tex. R. App. P. 33.1. Further, to the extent that the compensatory damages and future lost benefits awards overlapped, this Court's reduction of compensatory damages to $50,000 cures any error. The $150,000 awarded to Morrison in past compensatory damages included only noneconomic losses and therefore did not duplicate the award for future benefits at all. These past compensatory damages justify the $50,000 award despite any error in future compensatory damages.

We reverse the trial court's $254,880 award for future lost retirement and social security benefits and render judgment of $229,880 in its place.

*Reinstatement*

In its fourth and final point on appeal, the TWC argues that the trial court's reinstatement of Morrison was neither permissible nor feasible. It first argues that the trial court's award of front pay for future lost benefits precludes reinstatement. Front pay is an equitable remedy awarded to compensate the plaintiff for future lost wages and benefits. *Giles v. General Elec. Co.*, 245 F.3d 474, 489 n.27 (5th Cir. 2001). Therefore, the trial court's award for future lost retirement and social security benefits constitutes front pay. Front pay is generally considered an alternative to reinstatement where reinstatement is not a feasible option. *See Suggs v. ServiceMaster Educ.*

22

*Food Mgmt.*, 72 F.3d 1228, 1234 (6th Cir. 1996). Thus, the remedies of reinstatement and front pay are traditionally viewed as alternative, rather than cumulative. *Id*. This view exists because discrimination and retaliation awards must be reasonable. Their purpose is to fully compensate an injured party and put her in the same position she would have been absent retaliation. *Id*. TCHRA remedies should not create a windfall for the plaintiff. *Id.*

Morrison's circumstances, however, create a unique situation in which reinstatement does not fully compensate Morrison for her losses. Because Morrison took early retirement, her retirement account could not be reinstated, even were she to return to work. The lost value of her retirement accounts can only be remedied via front pay. Therefore, reinstatement only resolves one aspect of front pay: future lost wages; it does nothing to remedy any lost benefits. Because Morrison was not awarded any future lost wages, no windfall was created by the trial court's award of both future benefits and reinstatement. As the reasoning behind the traditional rule that front pay and reinstatement may not coexist does not apply in this instance, we cannot say that the trial court abused its discretion in awarding both.

The TWC also argues that reinstatement is not feasible due to continuing hostility between the parties. The feasibility of reinstatement is a fact-intensive question. The trial court found that: (1) Morrison is able to work; (2) Morrison can perform some service to the TWC Labor Division (to which reinstatement was ordered) or other appropriate division; and (3) there is no evidence of antagonism between Morrison and the TWC's Labor Division. These conclusions are supported by Morrison's testimony that she could successfully perform an Investigator V position within the Labor Division and the testimony of John Moore, the TWC's former general counsel and current director of regulatory integrity, that Investigator V within the Labor Division was one of five

23

jobs to which Morrison could be reinstated. Given this testimony, we cannot say that the trial court abused its discretion in awarding reinstatement. The TWC's fourth point of error is overruled.

*Attorney's Fees*

The trial court's judgment includes a $50,000 award for appellate attorney's fees that is contingent upon the TWC's appeal being "ultimately unsuccessful." Because Morrison has prevailed on three of four appellate issues, we conclude that Morrison is entitled to $50,000 in appellate attorney's fees.

**CONCLUSION**

Because we hold that a $50,000 statutory damages cap applies, we reverse that portion of the trial court's judgment awarding $300,000 in compensatory damages and render judgment that Morrison take $50,000 in compensatory damages. We further hold that the portion of the judgment awarding future lost retirement and social security benefits is excessive in the amount of $25,000 and reverse and render judgment that Morrison take $229,880 on that claim. We affirm the remainder of the trial court's judgment.[20]

_____

Diane M. Henson, Justice

Before Justices Puryear, Pemberton and Henson

Affirmed in part; Reversed and Rendered in part

Filed: July 8, 2011

---

[20] The TWC does not challenge the trial court's award of $149,801 in back pay.

24