# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

March 10, 2021

Lyle W. Cayce
Clerk

No. 20-50356

———

Doctor Melvin G. Perry, Jr.,

*Plaintiff—Appellant*,

*versus*

VHS San Antonio Partners, L.L.C., *doing business as* North Central Baptist Hospital,

*Defendant—Appellee*.

———

Appeal from the United States District Court
for the Western District of Texas
USDC No. 5:18-CV-404

———

Before Jolly, Stewart, and Oldham, *Circuit Judges*.

E. Grady Jolly, *Circuit Judge*:

The man at the center of this employment-discrimination appeal is Dr. Melvin G. Perry, Jr., an African-American pediatric intensivist. Dr. Perry treated children in the pediatric intensive care unit of a hospital owned by VHS San Antonio Partners, L.L.C. under his professional services agreement with Pediatric Inpatient Critical Care Services (PICCS), which itself operated under a separate coverage agreement with VHS. PICCS eventually terminated its professional services agreement with Dr. Perry at VHS's request. In response, Dr. Perry sued claiming race discrimination

No. 20-50356

under Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981.  The district court granted summary judgment dismissing his claims against VHS, dismissing his Title VII claim for lack of an employment relationship with VHS, and his § 1981 claim for lack of a contractual relationship with VHS. Dr. Perry appeals to us.  We hold that Dr. Perry's Title VII claim fails for lack of an employment relationship with VHS under either integrated-enterprise or joint-employment theories.  And we further hold that Dr. Perry's § 1981 claim fails because Dr. Perry cannot identify an impaired contractual right enforceable against VHS.  Consequently, we affirm the district court's partial final judgment.  (Dr. Perry's § 1981 claim against PICCS is still pending before the district court.)[1]

I

VHS is an entity that owns and operates North Central Baptist Hospital.  North Central Baptist is located in San Antonio, Texas and is the hub for pediatric care for the Baptist Health System in the area.  The pediatric intensive care unit is at the center of this dispute.  In December 2014, North Central Baptist needed physicians to treat patients in that unit.  To fill that need, VHS contracted with PICCS, a professional association owned by three physicians: Dr. Thomas Gowan, Dr. Hugo Carvajal, and Dr. Nelson Pedro Chavez.  The parties call this agreement the "coverage agreement," and we will do the same.

The purpose of the coverage agreement is to ensure that VHS has enough pediatric intensivists to treat the children in North Central Baptist's pediatric intensive care unit.  The agreement achieves that goal by making

---

[1] The district court entered a Federal Rule of Civil Procedure 54(b) partial final judgment authorizing this interlocutory appeal.

PICCS the "exclusive provider" of pediatric critical care services for North Central Baptist's pediatric intensive care unit.

Five features of the coverage agreement bear mention. First, the coverage agreement says that PICCS and its physicians "are acting as independent contractors, and shall not be considered employees or agents of" VHS. Second, the coverage agreement requires PICCS to pay its physicians fair market value. Third, the coverage agreement sets baseline qualifications for PICCS physicians; they must (a) be duly licensed and qualified to practice medicine in Texas; (b) be a participating physician in Medicare and in Texas's Medicaid program; (c) be approved for membership and/or clinical privileges on the medical staff of North Central Baptist; and (d) be Board Certified (or Board Eligible) in pediatrics. Fourth, the coverage agreement grants VHS's CEO the right to "request removal" of any PICCS physician "if continued service by such [p]hysician could jeopardize patient care or safety." Upon such a request, PICCS agrees to "immediately remove" the physician "in accordance with [North Central Baptist's] Medical Staff Bylaws." Fifth and finally, the coverage agreement obliges PICCS to appoint a director of the pediatric intensive care unit, "subject to the prior approval of" VHS's CEO.

To meet its obligations under the coverage agreement, PICCS required more physicians. So it placed an advertisement online, soliciting applications from pediatric critical care specialists. Dr. Perry responded. One of PICCS's owners, Dr. Carvajal, found Dr. Perry's application "attractive" and invited Dr. Perry to travel to San Antonio for an interview in January 2015.

The interview went well. Just two months later, Dr. Perry entered into a professional services agreement with PICCS. Three features of that agreement are relevant. First, Dr. Perry agreed to "render professional

medical services in the specialty of pediatric critical care medicine" at North Central Baptist. Second, Dr. Perry agreed that "the relationship between [PICCS] and him is that of an independent contractor." And third, Dr. Perry agreed to execute a separate "physician agreement" with VHS.

Dr. Perry signed the physician agreement a few weeks later. Under it, he agreed that he understood that he was bound by the terms of the coverage agreement between VHS and PICCS. He also agreed that North Central Baptist's "Medical Staff Bylaws shall control my termination of Medical Staff Membership and/or clinical membership." The physician agreement was signed only by Dr. Perry, purportedly "[i]n consideration of [his] approval by [VHS] to provide services" at North Central Baptist. Because the physician agreement is the basis for Dr. Perry's § 1981 claim against VHS, and the language of that agreement informs the analysis to follow, we set out the agreement in full:

> I, Melvin G. Perry, MD, am a member, associate, partner or employee of or an independent contractor under contract with **Pediatrics Inpatient Critical Care Services, P.A.** ("Group"). I understand that I am bound by all terms and conditions of the Agreement for Department coverage dated December 12, 2014 and effective March 1, 2015 (the "Agreement") between **VHS San Antonio Partners, LLC dba North Central Baptist Hospital** ("Hospital") and Group. In consideration of my approval by Hospital to provide services at North Central Baptist Hospital ("Hospital"), pursuant to the Agreement, I knowingly and voluntarily agree to the following.
>
> I understand, acknowledge and expressly agree that it is in the best interest of Hospital's ability to provide quality patient care in a cost-effective and efficient manner for Hospital to contract with an entity to be the exclusive provider of the Services for the Department. I further understand, acknowledge and agree

that upon expiration or earlier termination of the Agreement, with or without cause, Hospital shall have the right to grant an exclusive contract for the provision of Services to any person or entity.

I understand, acknowledge and agree that the Medical Staff Bylaws shall control any termination of Medical Staff Membership and/or clinical privileges. I understand, acknowledge and agree that unless and until such loss of membership occurs, I am bound by and subject to all provisions of the Bylaws, Rules and Regulations of Hospital and/or its Medical Staff.

Without limiting the foregoing in any way, I understand, acknowledge and agree that if the Agreement expires and/or terminates for any reason, and I continue to hold Medical Staff membership and/or exercise clinical privileges thereafter, this shall not, in any way, waive or restrain the Hospital from granting an exclusive contract for the provision of Services to any person or entity.

I agree that if any one or more of the provisions contained herein shall be held to be invalid, illegal or unenforceable for any reason, whether in whole or in part, such invalidity, illegality or unenforceability shall not affect any other provision hereof, and this Physician Agreement shall be construed as if such provision had never been contained herein.

BY MY SIGNATURE BELOW, I ACKNOWLEDGE THAT I HAVE CAREFULLY READ AND UNDERSTOOD THE ABOVE PHYSICIAN AGREEMENT, AND I HAVE CAREFULLY READ AND UNDERSTOOD THE AGREEMENT REFERRED TO ABOVE AND THAT I KNOWINGLY AND VOLUNTARILY AGREE TO THEIR TERMS.

Dr. Perry's stint at North Central Baptist was a short one.[2] He worked there under his professional services agreement with PICCS for just 22 months, from April 2015 to February 2017. During Dr. Perry's tenure, VHS did not pay his salary, did not bill for his services, did not pay for his continuing medical education or his membership in professional organizations, did not pay his malpractice insurance, did not create his schedule, and did not keep his personnel records.

In January 2017, North Central Baptist President Bill Waechter and North Central Baptist Chief Medical Officer Dr. Dana Kellis decided to terminate Dr. Perry's professional services agreement. Although the termination, officially, was without cause, Waechter testified that the contract was terminated because Dr. Perry had created a hostile work environment that was "putting . . . patient care in jeopardy."

This occasion was the first—and is the only—time VHS exercised its contractual right to request removal of a PICCS physician. PICCS complied with the request and sent Dr. Perry a letter informing him that "the Board of Directors of PICCS has directed to terminate" the agreement "without cause pursuant to Section 15.1" and giving Dr. Perry 90 days notice of the termination. Dr. Perry chose not to work through the full notice period and treated patients at North Central Baptist only through February 2017.

II

In response to the termination of his contract, Dr. Perry sued both PICCS and VHS under Title VII and 42 U.S.C. § 1981. He alleged that PICCS and VHS discriminated against him on the basis of his race and sex and subjected him to a hostile work environment. Regarding his

---

[2] The reader is reminded that VHS owns and operates North Central Baptist Hospital.

employment, he alleged that (a) both PICCS and VHS were his Title VII "employer," (b) PICCS and VHS were joint employers, and (c) PICCS and VHS constituted a single, integrated enterprise.

At the urging of PICCS and VHS, the district court bifurcated discovery on the employment-relationship issue from discovery on other issues. The district court ordered limited discovery "on the threshold issues of whether [Dr. Perry] was an employee of [PICCS] and whether [VHS] was a joint employer of [Dr. Perry]." The district court stayed discovery on the merits of Dr. Perry's claims, pending its ruling on dispositive motions regarding those threshold issues.

Dipositive motions followed. VHS sought summary judgment dismissing all of Dr. Perry's claims, contending the Title VII claim failed because Dr. Perry did not have an employment relationship with VHS, and the § 1981 claim failed because Dr. Perry did not have a contract with VHS. PICCS also moved for summary judgment, but it sought dismissal of the Title VII claim only. PICCS first contended that Dr. Perry's Title VII claim failed on the ground that PICCS did not meet the Title VII definition of "employer" because PICCS did not employ at least 15 people. *See* 42 U.S.C. § 2000e(b). PICCS next contended that the claim failed for the independent reason that application of the "hybrid economic realities/common-law control test" showed that Dr. Perry was an independent contractor, not an employee of PICCS. And PICCS last contended that VHS and it were not joint employers of Dr. Perry; Dr. Perry was an independent contractor of both entities.

The district court granted both motions for summary judgment in a lengthy opinion, analyzing the Title VII claims first and the § 1981 claim second.

The Title VII analysis was intricate. Starting with the claims against PICCS, the district court concluded that PICCS, standing alone, did not qualify as a Title VII "employer" because it did not employ at least 15 people. So PICCS could not be liable under Title VII unless Dr. Perry could aggregate PICCS's and VHS's employees by showing that PICCS and VHS constituted a single, integrated enterprise. Consistent with *Schweitzer v. Advanced Telemarketing Corp.*, 104 F.3d 761, 764 (5th Cir. 1997), the district court began the aggregation analysis by applying a "hybrid economic realities/common law control" test to determine whether Dr. Perry was an employee or independent contractor of PICCS. But application of that test yielded no answer: The district court found fact disputes bearing on Dr. Perry's status as a PICCS employee. Having found fact disputes concerning Dr. Perry's employment relationship with PICCS, the district court turned to VHS, asking whether that entity and PICCS constituted a single, integrated enterprise, such that both could be liable under Title VII. PICCS and VHS did not constitute an integrated enterprise, the district court decided, because Dr. Perry failed "to show the requisite degree of interrelation in daily employment matters." That conclusion left just one basis for imposing Title VII liability—joint employment. Again applying the "hybrid economic realities/common law control" test, the district court concluded that VHS did not qualify as a joint employer of Dr. Perry because VHS lacked meaningful control over Dr. Perry and his work. Given the district court's conclusions that (1) VHS was not a joint employer, (2) VHS and PICCS were not a single, integrated enterprise, and (3) PICCS, standing alone, did not employ enough people to qualify as a Title VII "employer," the district court entered summary judgment dismissing all of Dr. Perry's Title VII claims.

The § 1981 analysis proved simpler. Dr. Perry's § 1981 claim against VHS failed because, according to the district court, Dr. Perry did not have a

contractual relationship with VHS. Dr. Perry's "physician agreement" was not a contract covered by § 1981, the district court reasoned, because the physician agreement "d[id] no more than restate the fact that the [Medical Staff] Bylaws control membership and privileges and their termination" and thus created "no enforceable contract rights against VHS." In the light of its conclusion that Dr. Perry did not have a contract with VHS, the district court entered summary judgment dismissing Dr. Perry's § 1981 claim against VHS.

After the district court's summary-judgment ruling, one claim remained—a § 1981 claim against PICCS. Not wanting to delay this appeal, Dr. Perry moved for entry of a partial final judgment under Federal Rule of Civil Procedure 54(b), thus allowing entry of an appealable judgment on one or more claims even when trial-court litigation remains for other claims. The district court granted the motion, entering a partial final judgment dismissing all of Dr. Perry's claims against VHS, from which Dr. Perry takes this timely appeal.

In short, the only matters before us today are Dr. Perry's Title VII and § 1981 claims against VHS. His § 1981 claim against PICCS is still pending in the district court.

## III

We review the grant of summary judgment de novo. *West v. City of Houston*, 960 F.3d 736, 740 (5th Cir. 2020) (per curiam). Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material if it "might affect the outcome of the suit." *Id.* We view the evidence in the light most

favorable to the nonmovant and draw all reasonable inferences in that party's favor. *Adams v. Alcolac, Inc.*, 974 F.3d 540, 543 (5th Cir. 2020) (per curiam).

Dr. Perry makes three claims. First, he contends that VHS is liable under an "interference" theory of Title VII liability promulgated in *Sibley Memorial Hospital v. Wilson*, 488 F.2d 1338 (D.C. Cir. 1973). Second, he contends that the district court erred in granting summary judgment dismissing his Title VII claims for lack of an employment relationship with VHS. Third, he contends that the district court erred in granting summary judgment dismissing his § 1981 claim for lack of a contractual relationship with VHS. We consider his *Sibley* argument before turning to Title VII and then to § 1981.

IV

Dr. Perry contends—for the first time on appeal—that VHS is liable under *Sibley*'s "interference" theory. [3] We generally do not consider arguments raised for the first time on appeal. *See Stokes v. Emerson Elec. Co.*, 217 F.3d 353, 358 n.19 (5th Cir. 2000). But there are exceptions. For example, we may consider an issue "if the argument on the issue before the district court was sufficient to permit the district court to rule on it." *In re Liljeberg Enters., Inc.*, 304 F.3d 410, 427 n.29 (5th Cir. 2002). That is not the case here. Because Dr. Perry did not mention *Sibley* or even suggest the "interference" theory in the district court, the argument on the issue was not sufficient to permit the district court to rule on it. So Dr. Perry failed to

---

[3] Under *Sibley*'s "interference" theory, a plaintiff can bring a Title VII action against a defendant who is not his "actual" or "direct" employer if that defendant "control[s] access to" the plaintiff's employment and "den[ies] such access by reference to invidious criteria." 488 F.2d at 1342.

preserve his *Sibley* argument, and we decline to consider it. We turn to consider Dr. Perry's Title VII claim.

V

The basic premise of a Title VII case is that the plaintiff had an employment relationship with the defendant. *See Muhammad v. Dall. Cnty. Cmty. Supervision & Corr. Dep't*, 479 F.3d 377, 380 (5th Cir. 2007). Dr. Perry contends that he had an employment relationship with VHS on the basis of two alternative theories. First, he contends that VHS and PICCS were engaged in an integrated enterprise. Second, he contends that VHS was his joint employer, along with PICCS. We address each argument in turn.

A

Dr. Perry first contends that his evidence is sufficient to show that VHS and PICCS constituted a single, integrated enterprise. In Title VII cases, "'superficially distinct entities may be exposed to liability upon a finding they represent a single, integrated enterprise: a single employer.'" *Schweitzer*, 104 F.3d at 763 (quoting *Trevino v. Celanese Corp.*, 701 F.2d 397, 404 (5th Cir. 1983)). We apply a four-factor test to determine whether two entities are a single employer for Title VII purposes. *Johnson v. Crown Enters., Inc.*, 398 F.3d 339, 343 (5th Cir. 2005). The factors are "(1) interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control." *Vance v. Union Planters Corp.*, 279 F.3d 295, 297 (5th Cir. 2002) (citing *Trevino*, 701 F.2d at 403).

The first factor, interrelation of operations, "ultimately focuses on whether" one entity "excessively influenced or interfered with the business operations" of the other. *Lusk v. Foxmeyer Health Corp.*, 129 F.3d 773, 778 (5th Cir. 1997). Evidence that one entity is involved in the "daily

employment decisions" of the other is "central." *Schweitzer*, 104 F.3d at 765. The fact that one entity "ultimately benefitted from the activities" of the other "is irrelevant to whether their operations were interrelated." *Lusk*, 129 F.3d at 778. "Attention to detail, not general oversight, is the hallmark of interrelated operations." *Id.* (citing *Johnson v. Flowers Indus., Inc.*, 814 F.2d 978, 982 (4th Cir. 1987)). Evidence suggestive of interrelated operations includes (1) one entity's involvement in the other's daily decisions relating to production, distribution, marketing, and advertising; (2) shared employees, services, records, and equipment; (3) commingled bank accounts, accounts receivable, inventories, and credit lines; (4) one entity's maintenance of the other's books; (5) one entity's issuance of the other's paychecks; and (6) one entity's preparation and filing of the other's tax returns. *Id.* No such evidence is present here. More broadly, there is no evidence that VHS "excessively influenced or interfered with the business operations" of PICCS, which is the "ultimate focus[ ] " of this factor. *Id.* Still, Dr. Perry complains that the district court overlooked evidence that PICCS physicians are necessary to VHS's business and that VHS "coached" Dr. Perry by telling him that he needed to improve his conduct. But those facts do not reflect the degree of interrelatedness *Lusk* requires: They do not show VHS's "attention to detail" or its "excessive[ ] influence[ ] " in PICCS's business. *Id.* Consequently, this factor disfavors a finding that VHS and PICCS constitute a single, integrated enterprise.

The second factor, centralized control of labor relations, "has been called the most important one." *Johnson*, 398 F.3d at 343 (citing *Schweitzer*, 104 F.3d at 764). We have refined the inquiry into one question: What entity made the final decisions on employment matters regarding the person claiming discrimination? *Id.* (quoting *Trevino*, 701 F.2d at 404). To satisfy this factor, Dr. Perry points primarily to two items of evidence. First, he points to the coverage agreement between PICCS and VHS. That

agreement, as we have explained, grants VHS's CEO the right to "request removal" of PICCS physicians and requires PICCS, in turn, to "immediately remove" the physician "in accordance with . . . Medical Staff Bylaws." Second, he points to an email from North Central Baptist Chief Medical Officer Dr. Dana Kellis to North Central Baptist President Bill Waechter.[4] In that email, Dr. Kellis states that he met with PICCS's owner-directors, and "we reached the decision to tell Dr. Perry that he is being terminated without cause . . . ." The coverage agreement's grant of the power to request Dr. Perry's removal, and Dr. Kellis's reference to "we," suggest that both VHS *and* PICCS made the final decision to terminate Dr. Perry's professional services agreement. *See Trevino*, 701 F.2d at 404. Although VHS's power to request removal of a PICCS physician was exercised on only one occasion, such a power generally favors a finding that VHS and PICCS constitute an integrated enterprise.

The third factor, common management, disfavors a finding that VHS and PICCS are a single, integrated enterprise. PICCS's management consisted of Dr. Thomas Gowan, Dr. Hugo Carvajal, and Dr. Nelson Pedro Chavez. The VHS-owned North Central Baptist Hospital was managed by Bill Waechter. There is no overlap of managerial responsibilities.

The fourth and final factor, common ownership or financial control, also disfavors a single, integrated enterprise. Dr. Perry has not identified any commonality of ownership of VHS and PICCS, nor has he presented any evidence of shared financial control.

In sum, the first, third, and fourth factors indicate that VHS and PICCS do not constitute an integrated enterprise. But the second and most

---

[4] The reader is once again reminded that VHS owns and operates North Central Baptist Hospital.

important factor—centralized control of labor relations—as a general rule favors a finding that VHS and PICCS constitute an integrated enterprise. Nevertheless, this conclusion raises the question whether Dr. Perry's satisfaction of the second factor, such as it may be, standing alone, creates a genuine dispute of material fact, precluding summary judgment on the integrated-enterprise theory. The district court thought not, and we agree.

Although we have not confronted this precise question until today, the Equal Employment Opportunity Commission has offered some guidance. It has suggested that no single factor is dispositive of the integrated-enterprise analysis. *See* EEOC Compliance Manual, Section 2: Threshold Issues at III(B)(1)(a)(iii)(a), 2009 WL 2966755. Our cases have pointed us in a similar direction. In *Torres v. Liberto Manufacturing Co.*, we said that the plaintiff's reliance on the second factor, standing alone, was "not persuasive." 67 F. App'x 252, 2003 WL 21195924, at *3 (5th Cir. 2003) (per curiam). And in *Lusk*, we emphasized the need for evidence of "[s]ome nexus" to "daily employment decisions." 129 F.3d at 778 (citing *Schweitzer*, 104 F.3d at 765). The only evidence offered on that point in this case is that VHS exercised its contractual right to request that PICCS terminate Dr. Perry's professional services agreement. Apparently no such or similar event had occurred before. This singular involvement of VHS in PICCS's personnel retention demonstrates that reasonable jurors could not find that VHS was "so involved in the daily employment decisions of [PICCS] as to justify treating the two . . . as a single employer." *Id.* at 777 n.3 (citations omitted). Consequently, the district court did not err in concluding that Dr. Perry failed to create a genuine dispute of material fact on his integrated-enterprise theory. We now turn to consider Dr. Perry's next theory—joint employment.

B

Dr. Perry contends that even if he fails on his integrated-enterprise claim, he has surely offered enough evidence to survive summary judgment on the ground that VHS was a joint employer.  We lay the foundation to his argument, citing its definition:  "The term 'joint employer' refers to two or more employers that are unrelated or that are not sufficiently related to qualify as an integrated enterprise, but that each exercise sufficient control of an individual to qualify as [his] employer."   EEOC Compliance Manual, Section 2: Threshold Issues at III(B)(1)(a)(iii)(b), 2009 WL 2966755.

To determine whether an entity exercises enough control over an individual to qualify as his employer, we apply a "hybrid economic realities/common law control test." *Deal v. State Farm Cnty. Mut. Ins. Co. of Tex.*, 5 F.3d 117, 118–19 (5th Cir. 1993) (quoting *Fields v. Hallsville Indep. Sch. Dist.*, 906 F.2d 1017, 1019 (5th Cir. 1990) (per curiam), *cert. denied*, 498 U.S. 1026 (1991)).  The right to control the employee's conduct is the most important component of determining a joint employer.  *Id.* at 119 (citing *Fields*, 906 F.2d at 1019).  When examining the control component, we focus on the right to hire and fire, the right to supervise, and the right to set the employee's work schedule.  *Id.* (citing *Fields*, 906 F.2d at 1020; *Mares v. Marsh*, 777 F.2d 1066, 1068 (5th Cir. 1985)).  The economic-realities component of the "hybrid economic realities/common law control test" focuses on who paid the employee's salary, withheld taxes, provided benefits, and set the terms and conditions of employment.  *Id.* (citing *Mares*, 777 F.2d at 1068).

It is helpful that we previously have applied this "hybrid economic realities/common law control test" in the hospital-physician context.  *See Diggs v. Harris Hosp.-Methodist, Inc.*, 847 F.2d 270 (5th Cir. 1988).  We held

in *Diggs* that an obstetrician-gynecologist with staff privileges at a hospital failed to establish that she was an employee of the hospital.[5] *Id.* at 272. The hospital supplied the tools, staff, and equipment Diggs needed to treat patients, and the hospital "impose[d] standards" upon Diggs, as it did upon all physicians with staff privileges. *Id.* at 273. The hospital even required Diggs to have a "sponsor" present during surgical procedures. *Id.* Yet all of this involvement was insufficient. *Id.* We emphasized that the hospital did not "direct the manner or means" by which Diggs rendered medical care; it did not pay Diggs for her services; and it did not pay her licensing fees, professional dues, insurance, taxes, or retirement benefits. *Id.*

Applying this test here, we first find that the evidence of control is weak. To be sure, we already have discussed the only fact that reflects control—VHS's limited contractual right to "fire" Dr. Perry by requesting that PICCS terminate his professional services agreement. The other facts cut against control. First, VHS did not have the right to hire Dr. Perry. The coverage agreement delegated to PICCS the task of employing or contracting with physicians other than the Director of PICCS. Second, VHS did not have the right to set Dr. Perry's work schedule. PICCS created and maintained the work schedule for Dr. Perry. Dr. Perry himself even retained the right to adjust the schedule set by the PICCS Director.

---

[5] Cases from other circuits have reached the same general conclusion: A physician with hospital privileges is not a hospital employee for purposes of federal antidiscrimination law. *See, e.g.*, *Henry v. Adventist Health Castle Med. Ctr.*, 970 F.3d 1126, 1133 (9th Cir. 2020) (bariatric surgeon), *petition for certiorari filed*, No. 20-869 (Dec. 30, 2020); *Wojewski v. Rapid City Reg'l Hosp., Inc.*, 450 F.3d 338, 344 (8th Cir. 2006) (cardiothoracic surgeon); *Shah v. Deaconess Hosp.*, 355 F.3d 496, 500 (6th Cir. 2004) (general surgeon); *Vakharia v. Swedish Covenant Hosp.*, 190 F.3d 799, 806 (7th Cir. 1999) (anesthesiologist); *Cilecek v. Inova Health Sys. Servs.*, 115 F.3d 256, 263 (4th Cir. 1997) (emergency physician).

No. 20-50356

For example, Dr. Perry refused to work on dates that he had planned to take a trip to Australia and New Zealand. During some months, Dr. Perry, at his choosing, worked only one week at North Central Baptist, and he worked the rest of the month at Kids Time Pediatric locations in Georgia. Dr. Perry's power to determine his own work schedule and to offer his professional services at other locations suggests that he is an independent contractor, not an employee of VHS.[6] *See Henry*, 970 F.3d at 1131 (physician's freedom to run his own private practice was "inconsistent with employee status"); *Levitin v. Nw. Cmty. Hosp.*, 923 F.3d 499, 501–02 (7th Cir. 2019) (physician who could set her own hours and work at other hospitals was independent contractor—not employee—of hospital); *Cilecek*, 115 F.3d at 261 (same).

Thirdly, we ask whether VHS had the right to supervise Dr. Perry or to interfere with his exercise of professional medical judgment in any meaningful respect. Although Dr. Perry points to evidence that VHS provided him with the equipment and facilities he needed to treat his patients, that fact is insufficient to establish control. *See Diggs*, 847 F.2d at 273. Dr. Perry also points to "coaching" he received from VHS in response to complaints that he was "rude and condescending." The fact that an unidentified VHS employee "coached" Dr. Perry in a generalized way and "impress[ed] upon" him the "need to improve" his conduct clearly does not demonstrate VHS's power to control Dr. Perry's exercise of professional medical judgment. *See, e.g.*, *Henry*, 970 F.3d at 1132 (physician's obligation to abide by hospital regulations did not evidence "a right to control the manner and means of [his] practice"); *Cilecek*, 115 F.3d at 261–62

---

[6] Yet Dr. Perry insists that VHS set his schedule, complaining that a VHS employee, Shannon Herrod, scheduled his pediatric sedations "inappropriately." Herrod's "inappropriate" scheduling of pediatric sedations does not show that VHS set Dr. Perry's schedule because, as the district court noted, PICCS Director Chavez scheduled Dr. Perry on a 12-week cycle, subject to Dr. Perry's stated availability.

(physician's obligation to abide by hospital rules and regulations, "which regulated his work at the hospitals in substantial detail," did not transform him into hospital employee).  Dr. Perry also contends that VHS could require him to treat certain patients over his objections, but the argument finds only limited support in the record.  The argument rests on a single occasion in which "administration" transferred a pregnant, septic teenager to North Central Baptist Hospital over Dr. Perry's objection.  Dr. Perry testified that this was an example of VHS "forcing a patient onto [him]."  It is unclear from the record, however, what entity "forced" the patient on him, or whether the patient was indeed "forced" on him, given that the patient was transferred to another hospital at the request of a physician who agreed with Dr. Perry's assessment.  In any event, this one incident does not establish that VHS had the power to control Dr. Perry's exercise of professional medical judgment.  In sum, the evidence offered by Dr. Perry does not support the control component.

We move on now to address the economic-realities component of the "hybrid economic realities/common law control test."  As earlier noted, the economic-realities component focuses on "whether the alleged employer paid the employee's salary, withheld taxes, provided benefits, and set the terms and conditions of employment."  *Deal*, 5 F.3d at 119 (citing *Mares*, 777 F.2d at 1068).  VHS did none of these things.  It did not pay Dr. Perry's salary, bill for his services, pay for his continuing medical education courses or his membership dues to various professional organizations, pay for his malpractice insurance, create his schedule, or keep his personnel records.

Thus, neither component of the "hybrid economic realities/common law control" test supports an employment relationship between VHS and Dr. Perry.  Like the hospital in *Diggs*, VHS ultimately lacked the requisite control; it did not "direct the manner or means by which [Dr. Perry]

render[ed] medical care." 847 F.2d at 273. Consequently, we find no error by the district court in rejecting the joint-employer argument.

This conclusion coheres with *Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222 (5th Cir. 2015), on which Dr. Perry relies. There we considered whether a temporary employee assigned by a staffing company to a manufacturer had an employment relationship with the manufacturer under the "hybrid economic realities/common law control test." *Id.* at 227–28. We held that she did. *Id.* In so holding, we emphasized that the manufacturer supervised the temporary employee: The manufacturer "completed performance reviews" of the temporary employee's work and "delivered" "[o]n-the-job corrections and admonishment." *Id.* Here, such supervision, which we emphasized in *Burton*, is absent. To repeat, VHS did not have the right to supervise Dr. Perry or to interfere with his exercise of professional medical judgment in any meaningful respect. So we cannot agree that *Burton* requires reversal.

In sum, Dr. Perry did not have an employment relationship with VHS under either an integrated-enterprise or a joint-employment theory. Unable to show an employment relationship with VHS, Dr. Perry cannot prevail on his Title VII claim against VHS. We therefore affirm the summary judgment dismissing the Title VII claims against VHS, and turn to consider Dr. Perry's claim under § 1981.

## VI

Section 1981 does not supply "a general cause of action for race discrimination." *Arguello v. Conoco, Inc.*, 330 F.3d 355, 358 (5th Cir. 2003). It bars race discrimination *in contracting*. *See* 42 U.S.C. § 1981. It does so by guaranteeing to all persons within the jurisdiction of the United States the "same right . . . to make and enforce contracts . . . as is enjoyed by white citizens . . . ." *Id.* § 1981(a). It defines the phrase "make and enforce

contracts" to include "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." *Id.* § 1981(b).

Section 1981 requires a plaintiff to show that (1) he is a member of a racial minority; (2) the defendant had an intent to discriminate on the basis of race; and (3) the discrimination concerned one or more of the activities enumerated in the statute, such as the making and enforcing of a contract. *Bellows v. Amoco Oil Co.*, 118 F.3d 268, 274 (5th Cir. 1997) (citing *Green v. State Bar of Tex.*, 27 F.3d 1083, 1086 (5th Cir. 1994)). "Any claim brought under § 1981 . . . must initially identify an impaired contractual relationship under which the plaintiff has rights." *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476 (2006) (cleaned up). A § 1981 claim fails as a matter of law if the plaintiff lacks "rights under the existing (or proposed) contract that he wishes 'to make and enforce.'" *Id.* at 479–80 (quoting 42 U.S.C. § 1981).

Dr. Perry sued VHS under § 1981 claiming discrimination based on his race. He has failed, however, to identify in his complaint an "impaired contractual relationship [with VHS] under which [he] ha[d] rights," *id.* at 476, and therefore his complaint failed to state a plausible § 1981 claim. But VHS did not move to dismiss for failure to state a claim, choosing to move for summary judgment instead. Dr. Perry opposed that motion on the ground that his physician agreement created a contractual relationship with VHS. The district court disagreed, dismissing the § 1981 claim and holding that the physician agreement did not create a contractual relationship between Dr. Perry and VHS.

Although we will not specifically disagree with the holding of the district court, we will affirm the dismissal on a slightly different ground. *See Bluebonnet Hotel Ventures, L.L.C. v. Wells Fargo Bank, N.A.*, 754 F.3d 272, 276 (5th Cir. 2014) (We "may affirm summary judgment on any ground

supported by the record, even if it is different from that relied on by the district court.") (internal citation and quotation marks omitted).   The physician agreement was signed only by Dr. Perry, who executed the agreement "[i]n consideration of [his] approval by [VHS] to provide services" at North Central Baptist Hospital.  This language, however, refers to Dr. Perry meeting privileging credentials, not to any formal approval by VHS.  Under the physician agreement, Dr. Perry agreed that he understood that he was bound by the terms of the coverage agreement between VHS and PICCS.  He also agreed that North Central Baptist's "Medical Staff Bylaws shall control my termination of Medical Staff Membership and/or clinical membership."   VHS, on the other hand, is not shown to have agreed to anything.  It follows, then, that Dr. Perry failed to identify any right under the physician agreement that he seeks to "make and enforce" against VHS.  So his § 1981 claim fails.

Our conclusion that Dr. Perry failed to identify an enforceable contractual right against VHS does not end the discussion.  Dr. Perry further maintains that he can recover against VHS under § 1981 in the absence of a contractual relationship with VHS.  He urges us to hold that VHS has § 1981 liability because it "interfered" with his PICCS professional services agreement by requesting that PICCS terminate that agreement.   He contends that we recognized in *Faraca v. Clements*, 506 F.2d 956 (5th Cir. 1975), the right of a § 1981 plaintiff to sue a "third party"—that is, a non-party to the contract at issue—for interference with the plaintiff's right to make and enforce a contract.  So, for purposes of this case, Dr. Perry argues that *Faraca* allows him to bring a § 1981 claim against VHS—a "third party" to his professional services agreement with PICCS—for interfering with that agreement.

But Dr. Perry overreads *Faraca*. That case arose from the refusal of a state facility, the Georgia Retardation Center, to hire Dr. Andrew Faraca for an administrative position because Dr. Faraca, a white male, was married to an African-American woman. *Id.* at 958. Although Dr. Faraca was the best-qualified candidate for the position, the Director of the Center told a hiring officer not to hire Dr. Faraca because of "concern about the effects of the racially mixed couple on visitors and possible adverse reactions from state legislators." *Id.* Dr. Faraca was not hired. He responded by suing the Director for race discrimination under § 1981, claiming that the Director had interfered with his right to contract with a prospective employer, the State of Georgia. *Id.* After a bench trial, the district court held the Director personally liable to Dr. Faraca under § 1981. *Id.* at 957. We affirmed. *Id.* We did so despite the fact that the Director was, strictly speaking, a third party: Dr. Faraca did not have a contract with the Director, and the Director did not have the power to contract or refuse to contract with Dr. Faraca. *Id.* Because the Center was a State of Georgia facility, the State was the employer, and, according to the opinion, only it would have been in a position to refuse to enter into a contract with Dr. Faraca. *Id.* at 959.

Since we decided *Faraca*, however, we have clarified the reason for the Director's liability. *See Bellows*, 118 F.3d at 274. The Director "was only nominally a third party," we have explained. *Id.* Because the Director was acting on behalf of the State of Georgia when he instructed a subordinate not to hire Dr. Faraca, the Director and the State "were essentially one and the same." *Id.* Accordingly, we do not read *Faraca* to recognize, as Dr. Perry contends, a true third-party-interference theory of § 1981 liability. *See id.* Rather, we read *Faraca* to allow § 1981 liability where the "third party" and the contracting party are "essentially one and the same." *Id.* No evidence suggests that VHS and PICCS are "essentially one and the same." It

No. 20-50356

follows that Dr. Perry cannot recover against VHS under § 1981 on the theory initially articulated in *Faraca* and clarified in *Bellows*.

## VII

We now sum up. In this opinion, we have held that Dr. Perry did not have an employment relationship with VHS. We have rejected his argument that an employment relationship arose under either joint-employment or integrated-enterprise theories. Consequently, the district court did not err in granting summary judgment dismissing Dr. Perry's Title VII claims. We have further held that Dr. Perry has failed to show any contractual right enforceable against VHS under his "physician agreement" and have thus concluded that the district court did not err in granting summary judgment dismissing Dr. Perry's § 1981 claim. For these reasons, the partial final judgment of the district court, dismissing all of Dr. Perry's claims against VHS, is, in all respects,

AFFIRMED.