# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

August 16, 2023

Lyle W. Cayce
Clerk

No. 22-10686

---

Issam Abdallah; Abderraouf Alkhawaldeh,

*Plaintiffs—Appellants*,

*versus*

Mesa Air Group, Incorporated, *a Nevada Domestic Corporation*; Mesa Airlines, Incorporated, *a Nevada Corporation*,

*Defendants—Appellees*.

---

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 4:21-CV-540

---

Before King, Smith, and Elrod, *Circuit Judges*.

Jerry E. Smith, *Circuit Judge*:

On an otherwise-ordinary Mesa Airlines flight from Birmingham to Dallas Fort Worth International Airport, a flight attendant grew concerned about two passengers: plaintiffs Issam Abdallah and Abderraouf Alkhawaldeh. She alerted the pilot, who, despite the reassurance of security officers, delayed takeoff until the flight was canceled. The passengers were told the delay was for maintenance issues, and all passengers, including the two in question, were rebooked onto a new flight that reached DFW. After learning the real reason behind the cancellation, plaintiffs sued Mesa under 42 U.S.C.

§ 1981.   The airline countered that it had immunity under 49 U.S.C. § 44902(b), which allows an airline to remove a passenger it fears "is, or might be, inimical to safety," and 49 U.S.C. § 44941(a), which grants immunity to airlines for statements made to security officers regarding potential safety threats.   The strange fact pattern—namely, that all passengers had their flight canceled—raises several issues of first impression for this circuit: Whether such conduct constitutes disparate treatment under § 1981, whether a § 1981 claim can exist without a "breach" of contract, and whether § 44902(b) grants immunity to airlines for allegedly discriminatory decisions, thereby negating § 1981's application against airlines in this context.

Because plaintiffs have established genuine disputes of material fact, we reverse the summary judgment.

## I.

Plaintiffs bought their tickets from American Airlines; the flight was operated by Mesa.   Both plaintiffs are United States citizens and frequent fliers of American:  Abdallah held Gold status, and Alkhawaldeh held Executive Platinum status.   Both are "members of a racial and national origin minority group[] as Egyptian and Jordanian and members of the Arab, Middle Eastern and Muslim communities."

Abdallah boarded first.   After he found his seat, another passenger asked him to move, thinking Abdallah's seat was his.   Later, Abdallah asked Diana Trujillo, a flight attendant, whether he could move to an empty seat in the exit row.   She agreed.   When she later recited the exit-row instructions to him, Abdallah interrupted to "preemptively agree to assist in an emergency."   Plaintiffs say that this was because Abdallah was a frequent flier, had heard those instructions many times before, and was ready to rest.   Defendants state that Trujillo had never experienced that before.

Separated from Abdallah and not yet on the plane, Alkhawaldeh was

upgraded to first class because of his Executive Platinum status. He visited the restroom in the terminal, then asked the gate agent whether he could use his status to upgrade Abdallah as well. After his request was denied, he was the last to board the plane. Defendants found this "unusual" and contend that most first-class passengers board early to enjoy the first-class amenities. As Alkhawaldeh boarded, he gave the flight crew a package of chocolates that he had bought from a store in the airport. He placed his luggage into the overhead compartment, waved at Abdallah, and sat down. Trujillo found the wave to be "odd" but was unable to explain how it was different from a standard wave of the hand.

Trujillo became more concerned about plaintiffs. The passenger[1] who had mistakenly asked for Abdallah's seat told her that Abdallah had bullied him and asked for an explanation as to why Abdallah had moved to the exit row. The passenger then told Trujillo to report Abdallah to the captain as a security threat.

Trujillo had not seen the interaction between Abdallah and the passenger, and she had been a flight attendant for less than a year. She stated she felt "scared," so she alerted the captain of the passenger's suspicions, Abdallah's move to the exit row, his "premature acceptance of his exit-row responsibilities," and his wave to Alkhawaldeh. Hermon Hewitt, the captain,[2] asked Trujillo whether she was confident, to which Trujillo responded that her gut had "never been wrong."

Hewitt then spoke with the gate agent, American's Ground Security

---

[1] Defendants allege that not only the passenger in question but also a passenger sitting next to him complained to Trujillo. Plaintiffs maintain it was only the one passenger.

[2] Defendants note that Hewitt is a woman from Eritrea and "is of Middle Eastern descent."

Coordinator, Mesa's flight supervisor, dispatch, the Transportation Security Administration ("TSA"), and other law enforcement, telling them of her concerns and asking for help deplaning. India Smith, the Ground Security Coordinator, reported that Hewitt had "expressed heavily that . . . 'she is not flying this plane with a brother name[d] Issam on it,' after consistently bringing up what she presumed to be their racial ethnicity as Arabic, Mediterranean," and "was extremely ad[a]ment about the two passengers not flying . . . [be]cause of their names."[3]  Smith asked Trujillo to explain the suspicious hand gesture, but Trujillo "could not tell [her] or show [her] the hand gestures that were made to make her feel uncomfortable."  Ultimately, Smith concluded that based on plaintiffs' flight histories, calm demeanor, and reasonable actions, there was no safety risk.  The ground crew did a full search of the aircraft and instructed the crew to dump the lavatory waste, allegedly to "reassure Captain Hewitt and the flight crew."

The flight crew informed passengers that the flight was delayed for maintenance issues.  Plaintiffs were observed to be texting "on their phones in a different language."  Abdallah "quickly" got up to use the bathroom. The same passenger (or passengers, according to defendants) who had previously complained about Abdallah flagged Trujillo down to ask why he had "run to the bathroom," noting that the incident occurred right after an announcement that all passengers should remain in their seats.  Trujillo stood outside the door of the bathroom and listened to the sound of "liquid . . . being poured" into the lavatory, interrupted by "multiple flushes."  She found that suspicious but could not distinguish between those sounds and the sound of urination.

Despite the recommendations of ground security, Hewitt unilaterally

---

[3] Defendants state that Hewitt did not know the names of the passengers.

delayed takeoff until the 90-minute mark (at which point passengers would have to deplane). She stated that she was suspicious because Osama bin Laden's son had just been assassinated by the U.S. Government, and she was fearful of 9/11. The passengers all deplaned. Later, Alkhawaldeh heard a flight attendant telling a passenger that the flight was canceled for security concerns.

As plaintiffs stood in line to reschedule their flights, a plainclothes officer came to interrogate them. Other uniformed and plainclothes officers were also following and surveilling them. Finally, as they waited at their gate for their rescheduled flights, an FBI agent and uniformed police officer asked Alkhawaldeh to come into a private room for questioning. Alkhawaldeh refused questioning without a lawyer but handed over his identification and luggage for a search. The agent also asked to question Abdallah, who consented. Eventually, plaintiffs flew on their rebooked flights to their ultimate destination.

In short, the flight attendant—allegedly for discriminatory reasons—became concerned that the two were a safety concern and alerted the captain of the potential threat. The pilot, also for allegedly discriminatory reasons, ignored the recommendations of security agents and made the decision to cancel. The two passengers were not made aware of any safety concerns while on the flight, and they were treated exactly the same as the non-minority passengers: They were rebooked on a different flight to their eventual destination. The conditions of carriage for their tickets allowed for such re-bookings and stated that the scheduled flight time was not a part of the contract.

## II.

Plaintiffs sued Mesa and American for racial and national-origin discrimination under 42 U.S.C. § 1981 and Title VI of the Civil Rights Act of

1964. They then voluntarily dismissed all their claims except for the § 1981 claim against Mesa. The district court denied Mesa's motion to dismiss the remaining claim, holding that plaintiffs had alleged facts sufficient to permit a plausible inference that the stated security rationale was pretextual and that Mesa could not prove its entitlement to immunity under 49 U.S.C. § 44902(b).

Later, however, the district court granted Mesa's motion for summary judgment, concluding that plaintiffs could not survive on their § 1981 claim because they had not identified "a specific contract term" that Mesa had breached and because there was no "differential" treatment as applied to the contract terms (because all passengers were ordered to deplane, suffered a delay, and were reboarded and reached their destination). All "differential treatment," said the court, was "attributable to TSA, the FBI, or other airport security." Finally, the court held that Mesa was entitled to § 44902(b) immunity because Mesa "successfully show[ed] a reasonable relationship between the facts before the captain and her decision to deplane," and to § 44941(a) immunity over communications between the airlines and the security staff.

Plaintiffs appeal the summary judgment as to their § 1981 claim and the finding of immunity under § 44902(b).

### III.

We review a summary judgment *de novo*, "viewing all the facts and evidence in the light most favorable to the non-movant." *Badgerow v. REJ Props., Inc.*, 974 F.3d 610, 616 (5th Cir. 2020). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "A genuine dispute of material fact exists when 'the evidence is such that a reasonable jury could return a verdict for the nonmoving

party.'" *Badgerow*, 974 F.3d at 616 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

## IV.

Before we reach the merits, we must deal with Mesa's contention that the entirety of plaintiffs' appeal fails because it does not challenge one of the grounds of immunity found by the district court. Specifically, the district court found that two separate statutes—49 U.S.C. §§ 44902 and 44941—granted Mesa immunity, but plaintiffs have appealed only the § 44902 finding. Therefore, claim defendants, plaintiffs have forfeited any argument about § 44941(a) immunity, which they claim was a sufficient and independent ground for the summary judgment. *See Cap. Concepts Props. 85-1 v. Mut. First, Inc.*, 35 F.3d 170, 176 (5th Cir. 1994).

Mesa is correct that the district court held that it had immunity under § 44941(a). Mesa is also correct that plaintiffs did not appeal that decision in their opening brief. Any argument regarding this issue is therefore forfeited. *Tex. Mortg. Servs. Corp. v. Guadalupe Sav. & Loan Ass'n* (*In re Tex. Mortg. Servs. Corp.*), 761 F.2d 1068, 1073–74 (5th Cir. 1985). But Mesa is incorrect that said forfeiture dooms the entirety of plaintiffs' appeal. Section 44941(a) provides immunity for "a voluntary disclosure of any suspicious transaction . . . to any employee or agent of the Department of Transportation, the Department of Homeland Security, the Department of Justice, any Federal, State, or local law enforcement officer, or any airport or airline security officer." Thus, the district court held only that "Mesa is entitled to immunity for *any reports made to the proper authorities*," not that it was entitled to immunity for the entirety of plaintiffs' claims.

Although § 44941(a) grants immunity for any communications made between Mesa and external security agents—and to any impact that "flowed from the decisions made by such law enforcement officers," *Baez v. JetBlue*

No. 22-10686

*Airways Corp.*, 793 F.3d 269, 276 (2d Cir. 2015),[4] it does not grant immunity for things that occurred solely because of the airline's actions. The parties agree that the decision to delay the flight was Mesa's alone. They also agree that the security officials told Hewitt that there was no safety concern and that the plane should take off. Therefore, § 44941(a) does not grant immunity for Mesa's decision to cancel the flight or for other actions and statements attributable only to the airline.

Also, statements made to security officials can be considered as evidence for other claims. Congress enacted § 44941(b) "to give air carriers the 'breathing space' to report potential threats to security officials without fear of civil liability for a few inaptly chosen words." *Air Wis. Airlines Corp. v. Hoeper*, 571 U.S. 237, 257 (2014) (quoting *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 272 (1964)). That means that the airport cannot be held liable for its words alone. But § 44941(a) does not provide evidentiary privilege to those words—plaintiffs can use communications between Mesa and security officials as evidence for their discrimination-in-contracting claim, because the alleged liability stems from the reason to cancel the flight, not from "a few inaptly chosen words." *Id.*

V.

That settled, we proceed to the merits. Plaintiffs sued Mesa under 42 U.S.C. § 1981(a), which provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts." The district court concluded that § 1981 did not apply for two separate reasons: First, plaintiffs had not made a showing of

---

[4] We find the Second Circuit's extension of § 44941(a) reasonable, and we formally adopt it here. Because all the interrogations and searches done by security officials following the flight cancellation are "adverse consequences [that] flowed from the decisions made by . . . law enforcement officers," Mesa is immune. *Id.*

disparate treatment; second, Mesa had not breached a specific contractual term. That is error—plaintiffs have shown disparate treatment because they allege that their protected class was the but-for cause of the flight cancellation, and to survive summary judgment, plaintiffs do not need to identify a specific contractual term that was breached. Where a decision designated as discretionary under a contract is made but for the protected class, § 1981 applies.

*Disparate treatment*

To succeed on a § 1981 claim, plaintiffs must show that "(1) they are members of a [protected class]; (2) [d]efendants intended to discriminate on the basis of [that protected class]; and (3) the discrimination concerned one or more of the activities enumerated in the statute."[5] Plaintiffs can show discrimination in two ways: disparate treatment and disparate impact. *Pacheco v. Mineta*, 448 F.3d 783, 787 (5th Cir. 2006). Disparate treatment describes "actions that treat [a plaintiff] worse than others based on [his] race, color, religion, sex, or national origin." *Id.* Disparate impact involves "practices or policies that are facially neutral in their treatment of these protected groups, but, in fact, have a disproportionately adverse effect on such a protected group." *Id.* Plaintiffs' live complaint is best read as alleging disparate treatment.[6]

---

[5] *Body by Cook, Inc. v State Farm Mut. Auto. Ins.*, 869 F.3d 381, 386 (5th Cir. 2017). "[T]he analysis of discrimination claims under § 1981 is identical to the analysis of Title VII claims." *Id.*; *see also Pratt v. City of Houston*, 247 F.3d 601, 606 (5th Cir. 2001) (applying the Title VII analysis to a § 1981 claim).

[6] Specifically, plaintiffs allege that "defendants intentionally and purposefully discriminated against [them] based on their race and national origin when, by and through their employees and agents, they wrongfully singled out [p]laintiffs from their contracted-for flight and had them followed, interrogated, and searched" and that plaintiffs were "unable to enjoy the performance, benefits, privileges, terms, and conditions of the contract they entered into with [d]efendants because they were forced to deplane, followed,

No. 22-10686

The question is whether plaintiffs experienced disparate treatment.[7] The district court held that "[p]laintiffs . . . failed to provide any evidence that they were subjected to different contractual terms than other passengers. All passengers were ordered to deplane. All passengers suffered a delay. And all passengers, including [p]laintiffs, were boarded on the same later flight and reached their destination together." On appeal, defendants point out that plaintiffs "admitted they did not have any interactions or incidents with Mesa employees other than the usual interactions that accompany boarding an aircraft" and "were never treated differently than any of the other passengers." The contention is that because all passengers experienced the same flight cancellation, no disparate treatment occurred, so plaintiffs' § 1981 claim must fail.

We disagree. The "simple test" for determining whether disparate treatment has occurred is "whether the evidence shows treatment of a person in a manner which but-for that person's [protected characteristic] would be different." *City of L.A., Dep't of Water & Power v. Manhart*, 435 U.S. 702, 711 (1978) (internal quotation marks and citation omitted). Disparate treatment for a Title VII claim "is established whenever a particular outcome would not have happened 'but for' the purported cause. In other words, a but-for test directs us to change one thing at a time and see if the outcome changes. If it does, we have found a but-for cause." *Bostock v. Clayton*

---

interrogated, searched, and significantly delayed in arriving to their destination."

Because of the airline's immunity under § 44941(a), we focus on the impact of the deplaning, flight cancellation, and subsequent delay, all of which are purely attributable to Mesa. We do not consider the subsequent search and interrogation.

[7] In the alternative, plaintiffs contend that they do not need to show disparate treatment if they can establish intentional discrimination. We have no need to reach that issue.

*County*, 140 S. Ct. 1731, 1739 (2020) (citation omitted).[8]

Defendants' contention is that because all passengers experienced the same canceled flight, there was no disparate treatment—plaintiffs were treated the same as the non-minority passengers.  But that confuses the test.  Disparate treatment can be shown by comparing one person's experience to that of a person without the protected trait.  But it can also be shown if, but for that person's protected trait, the outcome would have been different.  Plaintiffs allege that but for their protected classes (race and national origin), the flight would not have been canceled.  That is an allegation of disparate treatment.

Defendants counter with *James v. American Airlines, Inc.*, 247 F. Supp. 3d 297, 304 (E.D.N.Y. 2017), and *Trigueros v. Southwest Airlines*, No. 05-CV-2256, 2007 WL 2502151, at *4 (S.D. Cal. Aug. 30, 2007), each of which compared the experience of the plaintiff (a racial minority) to that of a white passenger on the same plane.  Those cases are out of circuit and not precedential for us.  But, regardless, they do not contradict our holding:  In each, the court found disparate treatment when it compared a person with the protected trait to someone without the protected trait, which, as we noted above, is a sufficient but not necessary way of showing disparate treatment.  The test is whether the outcome would be different but for the protected class:  That can be shown by comparing the experience of the plaintiff to what his treatment would have been but for the protected class or by comparing the experience of the plaintiff to another individual without the protected class.  If either leads to a different outcome, disparate treatment has

---

[8] We note that *Bostock* based its reasoning on the specific phrasing of 42 U.S.C. § 2000e-2(a)(1), which is distinct from § 1981(a).  But we are bound by Fifth Circuit precedent: "[T]he analysis of discrimination claims under § 1981 is identical to the analysis of Title VII claims." *Body by Cook*, 869 F.3d at 386.

occurred.

To hold otherwise would lead to intolerable results—would an employer avoid Title VII liability if it merely started a hiring freeze every time a black man added his name to the applicant pool?  Could a school fire a female employee so long as it fired a male employee as well?  The Supreme Court tells us that the answer is no:  The but-for reason for the action, even though it happened to those not in the protected class as well, was discrimination based on the protected class.

*Breach of contract*

The district court also held that plaintiffs had not made out a § 1981 claim because they had not identified a "specific injur[y] caused by a racially motivated breach of contract."  Specifically, Mesa's Conditions of Carriage states that passengers are required to "[n]ot threaten the safety of the flight in any way," that Mesa "may not let [a passenger] fly if [he] . . . [p]ose[s] a risk to safety or security," and that such a passenger "may also be liable for any loss, damage or expense resulting from [his] conduct."  Further, the "flight schedule is not guaranteed and not part of this contract.  We are not liable if . . . [w]e change the schedule of any flight."  Accordingly, "there may be changes to . . . [d]eparture or arrival times."  Finally, "[w]hen your flight is cancelled . . . we'll rebook you on the next flight with available seats."  Based on those contractual provisions, the district court found that, because the passengers were later rebooked, Mesa's decision to cancel the flight did not breach the contract.

Defendants reiterate this theory on appeal.  Their reasoning appears to be that if a party to a contract decides to invoke a discretionary term of the contract for discriminatory reasons, § 1981 does not apply because there has been no breach.  But that contradicts both our precedent and the clear text of § 1981.

To succeed on a § 1981 claim, a plaintiff must show that "the discrimination concerned one or more of the activities enumerated in the statute." *Perry v. VHS San Antonio Partners, L.L.C.*, 990 F.3d 918, 931 (5th Cir. 2021). The enumerated activities are "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). Defendants' position fails on text alone: The right to be free from discrimination in "the enjoyment of all benefits, privileges, terms and conditions" means that one has the right to be free from discrimination in the discretionary "benefits, privileges, terms and conditions" of a contract, too. Defendants surely cannot claim that flying at the originally scheduled time is not a "benefit" of the contract at all, even if it is a completely discretionary one.

Our conclusion is reinforced by the provision's statutory history. Originally, § 1981 did not enumerate its included activities and forbade discrimination only in the "mak[ing] and enforce[ing]" of contracts. The Supreme Court originally interpreted "to make and enforce" as applying to "only conduct at the initial formation of the contract and conduct which impairs the right to enforce contract obligations through legal process." *Patterson v. McLean Credit Union*, 491 U.S. 164, 179 (1989), *superseded by statute as stated in CBOCS W., Inc. v. Humphries*, 553 U.S. 442 (2008).

Less than two years later, Congress added the expanded definition to § 1981(b), specifically including all the activities enumerated above. The Supreme Court has since stated that the addition "superseded *Patterson* and explicitly defined the scope of § 1981 to include post-contract-formation conduct," including things such as retaliation. *Humphries*, 553 U.S. at 451.

This circuit has similarly interpreted § 1981 in a broad sense. We have held that firing someone under a completely at-will contract with discriminatory intent is actionable under § 1981 despite noting that, "[u]nder well-

established Texas law, the employer may, absent a specific agreement to the contrary, terminate an employee for good cause, bad cause, or no cause at all." *Fadeyi v. Planned Parenthood Ass'n, Inc.*, 160 F.3d 1048, 1049 (5th Cir. 1998). That is squarely on point—if discrimination is a but-for reason that a discretionary benefit of a contract was changed, there has been discrimination in contracting such that § 1981 applies.

Defendants make two suggestions to the contrary, neither of which is persuasive. First, they suggest that *Fadeyi* does not matter because it was an employment case. But that is a distinction without a difference. We have no cases holding to the contrary in non-employment situations, and further, nothing in *Fadeyi* limits its holding to employment.

Second, defendants suggest that *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470 (2006), overruled *Fadeyi*. They point to one line taken out of context: "Section 1981 plaintiffs must identify injuries from a racially motivated breach of their own contractual relationship, not of someone else's." *Id.* at 480. In isolation, that statement does suggest that a § 1981 claim requires a breach of contract. But that is an incorrect reading of the case. First, *Domino's* was about whether a plaintiff could bring a § 1981 claim over a breach of a contract he was not a party to. The existence of the breach was assumed—the emphasis of that line is "their own," not "breach." In other words, *Domino's* involved a theory of racial discrimination based on a breach; it did not suggest that *all* theories of racial discrimination must be based on a breach.

Moreover, defendants' reading of the line makes it inconsistent with our caselaw more broadly. We know that the text of § 1981 is not limited to breaches but directly contemplates "making" and "modification" of contracts, so one line in *Domino's* cannot be read, without more, to exclude all other forms of § 1981 claims.

No. 22-10686

Again, interpreting § 1981 as defendants suggest would lead to absurd results. Would it be the case that an airline could bump all black passengers to a separate plane because the conditions of carriage allow for such a change? True, "[s]ection 1981 does not supply 'a general cause of action for race discrimination.' It bars race discrimination *in contracting.*" *Perry*, 990 F.3d at 931 (quoting *Arguello v. Conoco, Inc.*, 330 F.3d 355, 358 (5th Cir. 2003)). But the decision to modify a discretionary element of a contract is part of "the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). As we recognized in *Fadeyi*, Congress amended § 1981 at least in part to ensure that "Americans [would] not be harassed, fired or otherwise discriminated against in contracts because of their [protected class]." 160 F.3d at 1050 (citation omitted). The decision to cancel plaintiffs' flight fits.

## VI.

The district court held that even if the plaintiffs had made out a § 1981 claim against Mesa, 49 U.S.C. § 44902(b) grants immunity. That subsection provides that air carriers "may refuse to transport a passenger or property the carrier decides is, or might be, inimical to safety." This circuit has not directly interpreted § 44902(b) since it was recodified in 1994,[9] but our sister circuits have generally read a "reasonableness" or "not arbitrary and capricious" requirement into the statute.[10]

Guided by those other circuits, the district court read a reasonableness limitation into the statute and found Mesa's decision to cancel the flight not

---

[9] Revision of Title 49, Pub. L. No. 103-272, § 1(e), 108 Stat. 1204 (1994).

[10] *See Cerqueira v. Am. Airlines, Inc.*, 520 F.3d 1, 14 (1st Cir. 2008); *Williams v. Trans World Airlines*, 509 F.2d 942, 948 (2d Cir. 1975); *Eid v. Alaska Airlines, Inc.*, 621 F.3d 858, 867–68 (9th Cir. 2010); *Lu v. AirTran Airways, Inc.*, 631 F. App'x 657, 661–62 (11th Cir. 2015).

to be arbitrary and capricious.  In doing so, the court implied that Mesa had sufficient non-racially-motivated reasons to delay the flight, but the court did not address the interaction of §§ 44902 and 1981.

On appeal, plaintiffs contend that "[s]ection 44902(b) extends only to refusals to transport motivated by concerns about 'safety,' not racial discrimination," so § 44902(b) immunity cannot apply to a § 1981 claim.  Instead of arguing the other point, defendants acquiesce, stating, "Mesa d[oes] not argue that '[§] 44902(b) displaces [§] 1981.'  It argue[s] that it was entitled to immunity because Captain Hewitt's decision to have all passengers deplane *was not* based upon racial discrimination, but on a concern for safety."  As we discuss below, however, there is at least a genuine dispute as to that fact.

We therefore must decide the interaction of §§ 44902(b) and 1981. We hold that § 44902(b) does not provide immunity for a § 1981 claim:  If a passenger's protected status is the but-for cause of the airline's decision to remove that passenger, then § 44902(b) does not grant immunity to the airline because the decision was not made because the passenger was "inimical to safety."  49 U.S.C. § 1981.[11]

To hold otherwise would cause us to give effect to § 44902(b) over § 1981, which we are instructed not to do.  "When confronted with two Acts of Congress allegedly touching on the same topic, [courts are] not at 'liberty to pick and choose among congressional enactments' and must instead strive 'to give effect to both.'" *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1624 (2018) (quoting *Morton v. Mancari*, 417 U.S. 535, 551 (1974)).  That's because we

---

[11] Mesa additionally makes the strange argument that § 44902(b) does not apply because, by its terms, the statute applies to the "refusal" to transport a passenger, and Mesa did eventually transport plaintiffs.  That is the exact opposite of Mesa's position on appeal because, if § 44902(b) does not apply, the airline has no immunity.  We therefore disregard that argument.

presume that "'Congress will specifically address' preexisting law when it wishes to suspend its normal operations in a later statute." *Id.* (quoting *United States v. Fausto*, 484 U.S. 439, 453 (1988)).

Section 1981 prohibits discrimination in contracting. Section 44902(b) provides immunity to airlines in their decision to remove passengers they feel are "inimical to safety." There is a straightforward way to reconcile these two statutes: If a passenger's protected status is the but-for cause of the airline's decision to remove them (such that the passenger has made out a § 1981 claim), then § 44902(b) does not grant immunity to the airline because the decision is not based on a fear that the passenger was inimical to safety.

## VII.

We have so far held that if a but-for cause of Mesa's decision to cancel the flight was discrimination on the basis of a protected class, then (1) plaintiffs have made out a claim under § 1981 and (2) § 44902(b) would not confer immunity. If discrimination was not a but-for reason, then there is no § 1981 claim, and, regardless, the airline would be entitled to immunity. Therefore, whether discrimination was a but-for reason is a material dispute. *See Hamilton v. Segue Software, Inc.*, 232 F.3d 473, 477 (5th Cir. 2000) (per curiam) ("A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law.").

The dispute is also genuine. The record reflects that in her conversations with Smith, Hewitt repeatedly stressed plaintiffs' race and national origin. Smith related that Hewitt "expressed heavily that 'she is not flying this plane with a brother name[d] Issam on it,'" "consistently br[ought] up what she presumed to be their racial ethnicity as Arabic, Mediterranean," and "was extremely ad[a]ment about the two passengers not flying . . . [be]cause of their names." Further, every occurrence described as suspici-

ous could equally be seen as not suspicious:  A hand wave, refusing to leave one's assigned seat, boarding late, sleeping, and using the restroom are far from occurrences so obviously suspicious that no one could conclude that race was not a but-for factor for the airline's actions.  It is of course possible that a jury could find that it was not.  But that is not the question before us—because "a reasonable jury could return a verdict for" the plaintiffs, the dispute is genuine.  *Badgerow*, 974 F.3d at 616 (quoting *Anderson*, 477 U.S. at 248).

Given the genuine dispute as to a material fact, Fed. R. Civ. P. 56(a), summary judgment was inappropriate and is therefore REVERSED and REMANDED.  We place no limitation on the matters that the district court may address or decide on remand, and we express no view on what decisions should be made.